# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

—————————————————————————
)
**JONATHAN DIAZ**      )
           )
    *Petitioner,*    )
           )
v.            )
           )
**NED LAMONT**, Governor,   )
**CARLETON J. GILES**, Chairperson, )
Connecticut Board of Pardons and  )
Paroles, **ROLLIN COOK**, Commissioner, )
Connecticut Department of Correction, and )
**NICK RODRIGUEZ,** Warden,  )
Osborn Correctional Institution,  )
           )
    *Respondents.*   )
—————————————————————————)


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER AND
## ENLARGEMENT OF CUSTODY

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ....................................................................................................... **ii**

**INTRODUCTION** ...................................................................................................................... **1**

**FACTS** ....................................................................................................................................... **3**

   I.     The COVID-19 pandemic is a public health crisis. ....................................................... 3

   II.    Prisons are particularly susceptible to the spread of COVID-19. ................................. 4

   III.   Respondents are failing to adequately protect Mr. Diaz while he is incarcerated. ......... 7

   IV.   Mr. Diaz is particularly vulnerable to COVID-19 due to his mental illnesses and
intellectual disability. .................................................................................................................... 10

**ARGUMENT** .......................................................................................................................... **15**

   I.     Standard of Review ..................................................................................................... 15

   II.    Mr. Diaz faces irreparable harm if he continues to be incarcerated. ........................... 16

   III.   Mr. Diaz is substantially likely to succeed on the merits of his claims. ...................... 18

     A.   Respondents have discriminated against Mr. Diaz on the basis of his disability in
violation of the ADA. ................................................................................................................... 19

     B.   Respondents have exhibited "deliberate indifference" towards Mr. Diaz's medical
needs in violation of the Eighth Amendment. ............................................................................... 22

     C.   Exhaustion of state court remedies is not required because it would be futile. ............ 28

   IV.   The equities and public interest weigh in favor of releasing Mr. Diaz. ........................ 33

   V.    This Court has the equitable power to release Mr. Diaz while his habeas petition is
pending. ......................................................................................................................................... 35

**CONCLUSION** ...................................................................................................................... **38**

# TABLE OF AUTHORITIES

**Cases**

*AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384 (S.D.N.Y. 2002) ...................... 16

*Andino v. Fischer*, 555 F. Supp. 2d 418 (S.D.N.Y. 2008) ............................................................ 15

*Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ................. 17

*Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1953847, at *13 (S.D.N.Y. Apr. 23, 2020). 36, 37

*Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850, at *6 (N.D. Cal. Apr. 9, 2020) ....... 17

*Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003) ...................................................................... 24, 26

*Brown v. Plata*, 563 U.S. 493 (2011) ........................................................................................ 37

*Castillo v. Barr*, No. CV 20-00605 (C.D. Cal. Mar. 27, 2020) .................................................. 17

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ................................................................... 26

*Cholewinski v. Armstrong*, No. 3:98CV1964, 2000 WL 303252 (D. Conn. 2000) ..................... 32

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d
    Cir. 2010) ................................................................................................................................. 16

*Conn. Dep't Envtl. Prot. v. OSHA*, 356 F.3d 226 (2d Cir. 2004) ............................................... 17

*Connecticut Criminal Def. Lawyers Ass'n v. Lamont*, No. HHD-CV20___-S, (April 3, 2020),
    https://www.acluct.org/sites/default/files/100.31_2020-04-03_complaint.pdf. ......................... 8

*Coronel v. Decker*, ---F.Supp.3d---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ............ passim

*DeShaney v. Winnebago County Dep't Soc. Servs.*, 489 U.S. 189 (1989) .................................. 23

*Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392 (2d Cir. 1975) ... 37

*Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014) .......... 20

*Duckworth v. Serrano*, 454 U.S. 1 (1981) ............................................................................ 29, 33

*Estelle v. Gamble*, 429 U.S. 97 (1976) ................................................................................ 23, 26

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .............................. 16

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................................ 26, 27

*Ferreyra v. Decker*, No. 20 Civ. 3170, 2020 WL 1989417, at *12 (S.D.N.Y. Apr. 27, 2020) ... 36,
    37

*Francis S. v. Stone*, 995 F. Supp. 368 (S.D.N.Y. 1998), *aff'd,* 221 F.3d 100 (2d Cir. 2000) ....... 29

*Fulton v. Goord*, 591 F.3d 37 (2d Cir. 2009) ............................................................................. 19

G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994) ...... 34

*Gates v. Henderson*, 568 F.2d 830 (2d Cir. 1977) ...................................................................... 29

*Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994) ....................................................................... 22

*Gaymon v. Whidden*, No. 3:11-cv-805, 2011 WL 2078632 (D. Conn. 2011) ...................... 35, 36

*Grand River Enterprises Six Nations v. Pryor*, 425 F.3d 158 (2d Cir. 2005)............................. 34

*Harrison v. Barkley*, 219 F.3d 132 (2d. Cir. 2000) .................................................................... 26

*Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994) ..................................................................... 26

*Helling v. McKinney*, 509 U.S. 25 (1993) ....................................................................... 16, 25, 26

*Hernandez v. Decker*, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020) ......................................... 36

*Hill v. Mance*, 598 F. Supp. 2d 371 (W.D.N.Y. 2009) .............................................................. 32

*Iuteri v. Nardoza*, 662 F.2d 159 (2d Cir. 1980) .......................................................... 35

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ............................... 16

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ........................................................... 17

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) ........................................ 16

*Jumpp v. Cournoyer*, No. 3:15-CV-00892, 2016 WL 3647146 (D. Conn. 2016) ...................... 29

*L.O. v. Tsoukaris*, No. CV 20-3481 (JMV), 2020 WL 1808843, at *8 (D.N.J. Apr. 9, 2020)17, 34

*Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) .................................................. 23

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d
    1224 (2d Cir. 1992) .................................................................................. 15

*Lowery v. Cook*, No. 3:20-cv-00528 (D. Conn. Apr. 17, 2020),
    https://drive.google.com/file/d/1qXE6MRGTG7Y9wYPRZ1hQgnhBJMjsSfxi/view. ............. 8

*Lurie v. Wittner*, 228 F.3d 113 (2d Cir. 2000) ......................................................... 29

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ......................................................... 2, 35

*Mathis v. Hood*, 851 F.2d 612 (2d Cir. 1988) ......................................................... 31

*Maxum Petroleum, Inc. v. Hiatt*, No. 3:16-CV-01615 (VLB), 2016 WL 5496283 (D. Conn.
    2016) ............................................................................................. 15

*Medeiros* v. *Martin*, No. CV 20-178 WES, 2020 WL 1969363 (D.R.I. Apr. 24, 2020) ............... 2

*New York v. Sullivan*, 906 F.2d 910 (2d Cir. 1990) ..................................................... 33

*Ostrer v. United States*, 584 F.2d 594 (2d Cir. 1978) .................................................. 35

*Parks v. Blanchette*, 144 F. Supp. 3d 282 (D. Conn. 2015) .............................................. 20

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ............................................ 20

*Pimentel v. Gonzales*, 367 F. Supp. 2d 365 (E.D.N.Y. 2005) ............................................ 32

*Planned Parenthood of New York City v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d
    308 (S.D.N.Y. 2018) ................................................................................ 34

*Rado v. Meachum*, 699 F. Supp. 25 (D. Conn. 1988) .................................................... 35

*Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974) ....................................................... 37

*Riddick v. Dep't of Corr.*, No. 3:13-CV-656, 2013 WL 6118354 (D. Conn. 2013) .................... 21

*Riles v. Warden, State Prison*, No. 3:14CV1420, 2016 WL 1239220 (D. Conn. 2016) ............. 32

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ................................................... 16

*Sajous v. Decker*, 2018 WL 2357266 (S.D.N.Y. 2018) .................................................. 34

*Sallaj* v. *U.S. Immigration & Customs Enf't ("ICE")*, No. CV 20-167-JJM-LDA, 2020 WL
    1975819 (D.R.I. Apr. 24, 2020) ....................................................................... 2

*Sapienza v. Vincent*, 534 F.2d 1007 (2d Cir. 1976) .................................................... 31

*Savino v. Souza*, ---F.Supp.3d---, 2020 WL 1703844 (D. Mass. Apr. 8, 2020) ...................... 2, 36

*Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273 (1987) ................................................ 22

*Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264 (N.D.N.Y. 2015) ........................ 16

*Swain v. Murphy*, No. 308-CV-1394, 2010 WL 1279051 (D. Conn. 2010) ............................... 32

*Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) .................... 17

*Torrez v. Semple*, No. 3:17-CV-1232, 2018 WL 2303018 (D. Conn. 2018) .............................. 20

*U.S. ex rel. Goodman v. Kehl*, 456 F.2d 863 (2d Cir. 1972) .......................................................... 31

*United States v. Ardila*, No. 3:03-CR-264 (SRU), 2020 WL 2097736 (D. Conn. May 1, 2020) ... 2

*United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020) ............................................................................................................................................... 3

*United States v. Echevarria*, No. 317CR44MPSMPS, 2020 WL 2113604 (D. Conn. May 4, 2020) ................................................................................................................................... 2

*United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1916773 (D. Conn. Apr. 20, 2020) ................................................................................................................................... 2

*United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732 (D. Conn. Apr. 8, 2020) ............................................................................................................................ 2, 33, 37

*United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) ... 2, 36

*United States v. Perez*, No. 17 CR. 513-3, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) ............. 33

*United States v. Peters*, No. 3:18-CR-188 (VAB), 2020 WL 2092617 (D. Conn. May 1, 2020) .. 2

*United States* v. *Ramirez*, No. CR 17-10328-WGY, 2020 WL 2404858 (D. Mass. May 12, 2020) ............................................................................................................................................... 2

*United States v. Williams*, No. 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020) ................................................................................................................................... 2

*United States v. Zukerman*, No. 16 CR. 194, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) ......... 33

*Washington v. James*, 996 F.2d 1442 (2d Cir. 1993) .................................................................. 29

*Wilson v. Williams*, No. 4:20-cv-794, 2020 WL 1940882, at *4 (N.D. Ohio Apr. 22, 2020) passim

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................... 15

*Wright v. New York State Dep't of Corr.*, 831 F.3d 64 (2d Cir. 2016) ........................................ 19

*Young v. Choinski*, 15 F. Supp.3d 172 (D. Conn. 2014) (collecting cases) ................................ 23

**Statutes**

42 U.S.C. § 12102 ...................................................................................................................... 19

42 U.S.C. § 12132 ...................................................................................................................... 19

42 U.S.C. § 12182 ...................................................................................................................... 22

Connecticut General Statutes § 52-466 ....................................................................................... 30

**Other Authorities**

Bill Chappell, *73% of Inmates at an Ohio Prison Test Positive for Coronavirus*, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus ........................................................ 5

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the US*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 15, 2020). ....................................................................................................... 3

Centers for Disease Control and Prevention, *How to Protect Yourself & Others* (May 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf. .............. 4

Connecticut Department of Correction, *COVID-19 Tracker*, https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last visited May 15, 2020). ................................................................................................................. 1, 5, 7

Connecticut Department of Corrections, *Correctional Facility Population Count* (May 8, 2020), https://portal.ct.gov/OPM/CJ-About/CJ-SAC/SAC-Sites/daily-Population-Counts/LineChart-Total. ................................................................................................................. 8

Connecticut Department of Public Health, *COVID-19 Update*, https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5152020.pdf?la=en ........................................ 3

David Cloud & Brie Williams, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional* Settings (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf ....... 9

Department of Corrections and Community Supervision, *COVID-19 Report Daily Update*, https://doccs.ny.gov/doccs-covid-19-report (last visited April 21, 2020). ................................ 5

Eliza Fawcett & Steven Goode, *State Department of Correction moves inmates with COVID-19 to Northern Correctional Institution, though quarantine questions persist,* Hartford Courant (Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html. ........................ 8

Eliza Fawcett, *With COVID-19 Threat Looming, State Prisons and Jails Are on Edge*, Hartford Courant (Mar. 28, 2020). ................................................................................................................. 9

Elizabeth Weill-Greenberg, *Prisoners Who Test Positive for COVID-19 in Connecticut Are Sent to a Notorious Maximum Security Prison*, The Appeal (May 8, 2020), https://theappeal.org/connecticut-covid-19-prison-quarantine-northern-correctional-institution/ ................................................................................................................. 9

Jenna Carlesso & Kelan Lyons, *One Year After DOC Took Over Inmate Healthcare, Troubles Persist*, Conn. Mirror (July 2, 2019), https://ctmirror.org/2019/07/02/one-year-after-doc-took-over-inmate-healthcare-troubles-persist. ................................................................. 9, 27

Joint Hoyer-Sensenbrenner Statement on the Origins of the ADA Restoration Act of 2008, H.R. 3195 (section 1630.2(J)(1)(VII) ........................................................................................... 20

Judiciary Committee Habeas Corpus Matters Task Force, Meeting Minutes from Thursday, Sept. 18, 2019, available at https://www.cga.ct.gov/jud/tfs/20190729_Habeas%20Corpus%20Matters%20Task%20Force/20190918/9 -18-19%20Minutes%20of%20Habeas%20TF.pdf. ................................ 30

Kelan Lyons, *Osborn Prison on Lockdown After 105 Asymptomatic Inmates Test Positive for COVID-19*, CT Mirror (May 15, 2020), https://ctmirror.org/2020/05/15/osborn-prison-on-lockdown-after-105-asymptomatic-inmates-test-positive-for-covid-19/ ................................ 5

Kelan Lyons, *Elderly Prisoners in Connecticut Vulnerable to Potential Coronavirus Outbreak*, CT Mirror (Mar. 11, 2020) https://www.courant.com/coronavirus/hc-pol-coronavirus-connecticut-prisons-20200311-ote3jd6orje77ipl44qgi3bb6i-story.html. ................................ 27

Kelan Lyons, *Shifting Plans and a COVID-19 Outbreak at a Connecticut Prison*, CT Mirror (Apr. 17, 2020), https://ctmirror.org/2020/04/17/shifting-plans-and-a-covid-19-outbreak-at-a-connecticut-prison. ................................................................................................................. 26

Lisa Backus, *Staffing Shortage Creates 'Dangerous' Situation in CT Prisons*, Conn. Post (Feb. 3, 2020) ................................................................................................................. 9

Marc E. Fitch, *Showers "Off Limits" for prisoners housed in COVID quarantine units*, Yankee Institute for Public Policy, May 14, 2020, available at: https://yankeeinstitute.org/2020/05/14/showers-off-limits-for-prisoners-housed-in-covid-quarantine-units/. ................................................................................................................. 7

New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 15, 2020). ..................................................................................................................................... 4, 5

New York Times, *Coronavirus Map: Tracking the Global Outbreak*, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited May 15, 2020). ........................................................................................................................................ 3

Press Release, Conn. Dep't of Corr., The Department of Correction Continues Essential Operations while ........................................................................................................... 10

Press Release, Ned Lamont, Governor, State of Conn., Governor Lamont Provides Updates on Connecticut's ............................................................................................................... 10

Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).................................................... 37

Rollin Cook, All-Staff Memo Re: Mass Testing for the Novel Coronavirus (May 12, 2020), https://portal.ct.gov/-/media/DOC/Pdf/Coronavirus-3-20/All-Staff-Memo-re-COVID19-Mass-Testing-051220.pdf?la=en. ............................................................................................ 5, 9, 25

Rosana E. Norman et al., *The Long-Term Health Consequences of Child Physical Abuse, Emotional Abuse, and Neglect: A Systematic Review and Meta-Analysis*, 9 PLoS Med. 1, 21 (2012)................................................................................................................................... 11

State of Conn. Judicial Branch, Habeas Case Analysis (July 29, 2019)....................................... 30

State of Connecticut Judicial Branch, *COVID-19 Information from the Connecticut Judicial Branch* (Apr. 17, 2020), https://jud.ct.gov/COVID19.htm....................................................... 30

State of Connecticut Judicial Branch, *Reduced Day of Operation at State Courthouses,* (Apr. 3, 2020), https://jud.ct.gov/HomePDFs/Reduced_Days_Courthouses.pdf.................................. 30

Todd I. Herrenkohl et al., *Intersection of Child Abuse and Children's Exposure to Domestic Violence*, 9 Trauma, Violence & Abuse 84, 90-91 (2008). ..................................................... 11

Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239, 1239 (2020). ........................................................................................................ 4

# INTRODUCTION

Petitioner Jonathan Diaz is a 26-year-old man with serious mental illnesses, including post-traumatic stress disorder ("PTSD"), major depressive disorder, intellectual disability, and attention deficit hyperactivity disorder ("ADHD") held in the custody of at Osborn Correctional Institution ("Osborn CI"). For two weeks, he was denied the ability to shower, make phone calls, or even leave his cell, and the facility is on lockdown due to over 100 new positive COVID-19 cases in two days. He is being denied medication for his mental illnesses despite experiencing acute levels of anxiety, and denied the ability to maintain social distancing. He seeks emergency relief from this Court in the form of enlargement of custody, or bail, pending adjudication of his habeas petition.

The treatment Department of Correction ("DOC") officials are subjecting him to—isolation in his cell for almost 24 hours a day, denial of CDC-recommended guidelines for social distancing, hygiene or sanitation—justifies this relief. Mr. Diaz is serving a six-month term of imprisonment for a non-criminal, or technical, special parole violation. His release date is June 9, less than a month away. However, despite the imminent risk of contracting severe COVID-19 and of experiencing further psychological suffering, he remains confined in perilous conditions by Respondents. For these reasons, he moves for emergency relief from this Court.

COVID-19 has already spread widely in the state prison system. As of May 15, 369 Connecticut Department of Correction ("DOC") staff members and 598 incarcerated individuals have contracted the virus.[1] To date, six incarcerated individuals have died. As a result of Respondents' practices, Mr. Diaz continues to be held in life-threatening conditions at Osborn CI, rendering the fact of his confinement unlawful. The status quo amounts to an ongoing

---

[1] Connecticut Department of Correction, *COVID-19 Tracker*, https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last visited May 15, 2020).

deprivation of Mr. Diaz's statutory and constitutional rights under the Americans with Disabilities Act ("ADA") and the Eighth Amendment.

Mr. Diaz seeks recourse through this Court's inherent authority to enlarge his custody, also called admit to bail, immediately pending adjudication of this habeas petition, *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). *See Wilson v. Williams*, No. 4:20-cv-794, 2020 WL 1940882, at *4 (N.D. Ohio Apr. 22, 2020) (granting preliminary injunction and ordering enlargement of medically-vulnerable prisoners in light of COVID-19), *motion to stay preliminary injunction partially denied*, No. 20-3447, 2020 WL 2120814 (6th Cir. Apr. 30, 2020)). Every day that Mr. Diaz is imprisoned in conditions that exacerbate his disabilities is another day he is subjected to an unjustifiably increased risk of contracting COVID-19 and suffering permanent and irreparable harm. District courts around the country have recognized the gravity of the current situation and ordered vulnerable individuals released from prison and other forms of government detention under similar circumstances. *See, e.g.*, *United States v. Echevarria*, No. 317CR44MPSMPS, 2020 WL 2113604 (D. Conn. May 4, 2020); *United States v. Peters*, No. 3:18-CR-188 (VAB), 2020 WL 2092617 (D. Conn. May 1, 2020); *United States v. Ardila*, No. 3:03-CR-264 (SRU), 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Williams*, No. 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020); *United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1916773 (D. Conn. Apr. 20, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732 (D. Conn. Apr. 8, 2020); *United States* v. *Ramirez*, No. CR 17-10328-WGY, 2020 WL 2404858 (D. Mass. May 12, 2020); *Savino v. Souza*, ---F.Supp.3d---, 2020 WL 1703844 (D. Mass. Apr. 8, 2020); *Medeiros* v. *Martin*, No. CV 20-178 WES, 2020 WL 1969363 (D.R.I. Apr. 24, 2020); *Sallaj* v. *U.S. Immigration & Customs Enf't ("ICE")*, No. CV 20-167-JJM-LDA, 2020 WL 1975819 (D.R.I. Apr. 24, 2020); *United States v.*

*Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020). Mr. Diaz

respectfully requests that this Court immediately do the same.

**FACTS**

**I.      The COVID-19 pandemic is a public health crisis.**

COVID-19 is a highly infectious, novel coronavirus that has reached pandemic status. As

of May 15, 2020, more than 4.4 million individuals in at least 177 countries have been diagnosed

with COVID-19 and at least 303,498 people have died as a result.[2] In the United States alone,

more than 1.4 million people have been diagnosed with coronavirus as of May 15,[3] with over

36,000 confirmed cases and 3,285 deaths in the state of Connecticut.[4] A vaccine for COVID-19

is not expected to be available until mid-2021 at the earliest. Declaration of Dr. Gregg S.

Gonsalves ¶ 5 ("Gonsalves Decl."). COVID-19 is 10 times deadlier than severe seasonal

influenza. *Id.* ¶ 7. It causes severe disease in approximately 14 percent of cases. *Id.* ¶ 3. Up to 20

percent of infected patients require hospitalization. *Id.* ¶ 10. Fatality rates for COVID-19 are also

higher for certain subpopulations: older adults and people of any age with serious underlying

medical conditions. *Id.* ¶ 4. Individuals in these subpopulations are at a substantially higher risk

of developing severe illness from COVID-19, and are therefore at a higher risk for

hospitalization, intensive care needs, and death.

Transmission of COVID-19 is thought to occur predominantly via person-to-person

contact, as well as contact with infected surfaces. *Id.* ¶ 8. Coughing and sneezing produce

---

[2] New York Times, *Coronavirus Map: Tracking the Global Outbreak*,
https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited May 15, 2020).
[3] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the US*,
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 15, 2020).
[4] Connecticut Department of Public Health, *COVID-19 Update*,
https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5152020.pdf?la=en (last visited May 15, 2020).

respiratory droplets which spread COVID-19 to individuals in close proximity—as far as six feet away—even when an infected person is no longer in the immediate vicinity. *Id.* Containment and social distancing are two primary interventions to prevent the spread of COVID-19. Containment includes intensive handwashing, decontamination of surfaces, and identification and isolation of infected individuals and close contacts.[5] Social distancing involves remaining at least 6 feet from other people. Gonsalves Decl. ¶ 21.

COVID-19 progresses in two phases. *Id.* ¶ 10. In the first, an individual may be asymptomatic but more often presents with symptoms like cough, congestion, and fever; viral transmission during this phase is particularly likely. *Id.* In the second, life-threatening phase, about 20 percent of infected patients develop progressive lung disease requiring hospitalization. *Id.* Most of those requiring mechanical ventilation die. *Id.* 2.3 percent of all patients who contract the virus die.[6] For those who survive, a prolonged recovery is anticipated. *Id.* ¶ 7. Extensive rehabilitation secondary to profound deconditioning, neurologic damage, and loss of respiratory capacity can be expected for those who have experienced an illness of this severity. *Id.*

## II.     Prisons are particularly susceptible to the spread of COVID-19.

Prisons have become some of the largest hotspots of coronavirus outbreaks in the United States. Of the twenty-five largest clusters of COVID-19 cases in the United States—all with at least 362 cases—eighteen are in prisons and jails. The three largest outbreaks in the entire United States are all taking place within correctional institutions, the largest—Marion Correctional Institution—with 2,439 cases.[7] Over 70 percent of the incarcerated population of that prison has

[5] Centers for Disease Control and Prevention, *How to Protect Yourself and Others* (May 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.
[6] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239, 1239 (2020).
[7] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 15, 2020).

contracted COVID-19, and the prison accounts for 10 percent of the entire state's cases of the illness.[8] In New York, there are over 1,700 confirmed COVID-19 cases in jails and prisons, of which approximately 70 percent are correctional staff.[9] This high rate of COVID-19 infection among staff is a particularly significant challenge for preventing viral spread within facilities.

The situation is no less dire in Connecticut, which has reported nearly 1,000 confirmed COVID-19 cases in DOC correctional facilities—over 60 percent of whom are incarcerated individuals.[10] Osborn CI has been hard-hit by the virus, as it DOC reported approximately a quarter of all infected incarcerated individuals in DOC custody last week.[11] Just today it became clear that the outbreak is much worse and DOC was undertesting, as in two days of large-scale testing of its population[12] preliminary results show at least 100 individuals testing positive.[13] The extent to which the pandemic has already spread within DOC jails and prisons indicates the difficulty of effective pandemic containment within a carceral setting. Gonsalves Decl. ¶ 14.

This trend mirrors prior outbreaks within prisons, as prisons are congregate settings that are particularly susceptible to the spread of infectious diseases. *Id*. ¶ 18-20. For example, HIV, Hepatitis B and C, and tuberculosis are significantly more common in prisons than in the community-at-large. *Id.* In addition, severe outbreaks of H1N1 influenza occurred in prisons during the epidemic in 2009. *Id.* ¶ 18.

---

[8] *See* Bill Chappell, *73% of Inmates at an Ohio Prison Test Positive for Coronavirus*, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus; New York Times, *Coronavirus in the U.S.: Latest Map and Case Count,* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 15, 2020).
[9] Department of Corrections and Community Supervision, *COVID-19 Report Daily Update*, https://doccs.ny.gov/doccs-covid-19-report (last visited May 15, 2020).
[10] Connecticut Department of Correction, *COVID-19 Tracker*, https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last visited May 15, 2020).
[11] *Id*.
[12] Rollin Cook, All-Staff Memo Re: Mass Testing for the Novel Coronavirus (May 12, 2020), https://portal.ct.gov/-/media/DOC/Pdf/Coronavirus-3-20/All-Staff-Memo-re-COVID19-Mass-Testing-051220.pdf?la=en.
[13] Kelan Lyans, *Osborn Prison on Lockdown After 105 Asymptomatic Inmates Test Positive for COVID-19*, CT Mirror (May 15, 2020), https://ctmirror.org/2020/05/15/osborn-prison-on-lockdown-after-105-asymptomatic-inmates-test-positive-for-covid-19/.

As the outbreak in Osborn shows, prisons are poorly equipped to handle COVID-19, as evidenced by their response to other contagions. *Id.* ¶ 19. Outbreaks of tuberculosis have proven hazardous, and in some cases deadly, as prisons are unable to efficiently diagnose, isolate, and treat people who are infected. *Id.* ¶ 20. COVID-19 differs substantially from tuberculosis due to its higher prevalence in the community and efficient mode of transmission. *Id.* These factors are exacerbated by the inability to isolate people who are infected or are at risk of becoming infected with COVID-19 as well as the heightened potential for correctional officers and other staff to transmit COVID-19 from the outside community into prisons. *Id.* ¶ 20, 32.

Screening and isolation of symptomatic cases alone will not prevent viral spread in Connecticut's prison system; prisons face a daily influx of persons from community settings, including both correctional staff and newly incarcerated individuals. Incarcerated individuals are constantly in close proximity, and regularly interact with communal surfaces. *Id.* ¶ 21. Social distancing cannot be effectively accomplished in prison settings because of the inability to create physical barriers between beds, the use of common spaces like dining halls, showers, and bathrooms, the lack of sanitary equipment to regularly disinfect surfaces, the lack of personal protective equipment for personnel and prisoners alike, and the inability to identify asymptomatic infectious persons. *Id.* ¶¶ 19-23.

Individuals experiencing severe COVID-19 infections will need to be transported to local hospitals and, often, to intensive care units because prisons do not have the adequate facilities or equipment to treat seriously ill patients. *Id.* ¶¶ 23-26. Prison health care systems lack necessary emergency medical equipment, personal protective equipment, and other necessary supplies to treat those in severe respiratory distress. *Id.* ¶¶ 23-24. Outside healthcare systems, already

overburdened by growing caseloads, are likewise unable to handle an influx of patients from prisons which, if significant preventive measures are not taken, could be substantial. *Id.* ¶ 23.

### III.     Respondents are failing to adequately protect Mr. Diaz while he is incarcerated.

The conditions across DOC facilities and in Osborn CI are such that they render the fact of Mr. Diaz's confinement unlawful. For two weeks leading up to May 11, Mr. Diaz's block was placed on quarantine. Declaration of Jonathan Diaz ("Diaz Decl.") ¶¶ 14-15. He has been imprisoned with a cellmate from whom he cannot stay six feet away, despite the fact that inmates in his block, a number of whom were housed just a few cells away from him, have either displayed symptoms or tested positive for the illness. *Id.* ¶¶ 16, 20. In addition, he is being denied basic hygiene and necessary mental health care. He could not shower for two weeks,[14] and has been denied prescribed medication. *Id.* ¶ 21. On May 11, Mr. Diaz was released from quarantine with restrictions for three days, but as of the date of this filing, Mr. Diaz is once again in quarantine for another two weeks. *Id.* ¶ 15.

Over the past few weeks, it has become clear that DOC is inadequately protecting those imprisoned at Osborn CI. 123 individuals incarcerated at Osborn CI who tested positive were transferred to Northern CI's Medical Isolation Unit.[15] As of May 15, 369 staff members and 598 incarcerated individuals in DOC have tested positive, and six individuals have died.[16] These numbers have more than doubled from the past month.[17]

---

[14] The DOC's denial of access to showers appears to be a statewide policy. *See* Marc E. Fitch, *Showers "Off Limits" for prisoners housed in COVID quarantine units*, Yankee Institute for Public Policy, May 14, 2020, available at: https://yankeeinstitute.org/2020/05/14/showers-off-limits-for-prisoners-housed-in-covid-quarantine-units/.
[15] Connecticut Department of Correction, *COVID-19 Tracker*, https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last visited May 15, 2020). Although the DOC has stated a policy of transferring individuals positive for the virus to Northern, today it did not report transferring those who tested positive at Osborn CI.
[16] *Id.*
[17] *Id.* (reporting 165 positive staff members and 246 positive inmates as of April 17, 2020).

Prisoners have had masks starting only a few weeks ago, long after the first reported cases within DOC. Diaz Decl. ¶ 18. They have no access to hand sanitizer or gloves. *Id.*

In other DOC facilities, staff have returned prisoners who have high temperatures back to their dormitories if they do not have additional symptoms, even though fever is a hallmark symptom of COVID-19.[18] In April, multiple individuals at Osborn CI who were quarantined based on having come into contact with someone displaying COVID-19 symptoms were mistakenly released from quarantine back into the general population.[19] Inmates in DOC custody report a lack of adequate access to hand sanitizer, cleaning supplies, and soap to protect themselves from infection.[20] Effective May 1, 2020, DOC has implemented a policy that has shut down all access to showers in all of its facilities. Gonsalves Decl. ¶ 15.

To date, Respondents have failed to take steps to meaningfully reduce their inmate population. As of May 8, there were 2,997 people in pre-trial detention, and 7,780 people serving sentences of incarceration in Connecticut's prison system,[21] down from 3,393 pretrial detainees and 8,891 sentenced inmates on January 1, 2020.[22] While population reductions of any size are more desirable than none, a reduction of this size is insufficient to slow the virus's spread. Respondents have instead increased both the inhumanity and ineffectiveness of their response through the piecemeal removal of inmates into conditions of solitary confinement at Northern

[18] Habeas Petition at 4, *Lowery v. Cook*, No. 3:20-cv-00528 (D. Conn. Apr. 17, 2020), https://drive.google.com/file/d/1qXE6MRGTG7Y9wYPRZ1hQgnhBJMjsSfxi/view.
[19] Eliza Fawcett & Steven Goode, *State Department of Correction moves inmates with COVID-19 to Northern Correctional Institution, though quarantine questions persist,* Hartford Courant (Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html.
[20] *Id.*
[21] Connecticut Department of Corrections, *Correctional Facility Population Count* (May 8, 2020), https://portal.ct.gov/OPM/CJ-About/CJ-SAC/SAC-Sites/daily-Population-Counts/LineChart-Total.
[22] Complaint at 6, *Connecticut Criminal Def. Lawyers Ass'n v. Lamont*, No. HHD-CV20___-S, (April 3, 2020), https://www.acluct.org/sites/default/files/100.31_2020-04-03_complaint.pdf.

Correctional Institute,[23] a super-max facility that is medically and constitutionally inappropriate for Mr. Diaz.[24] Even this draconian solution is likely to prove inadequate to deal with the large number of positive test cases at Osborn, as evidenced by a recent memorandum suggesting that there may be too many positive cases at Osborn to transfer to Northern—instead, those individuals would be kept in medical "isolation" at Osborn.[25] Respondents do not have the capacity to contain the exponential growth of COVID-19 within its facilities while also ensuring the safety of individuals like Mr. Diaz.

Connecticut has long struggled to provide adequate medical services to incarcerated individuals; its medical infrastructure is ill-equipped to handle an outbreak of this magnitude. Declaration of Allen S. Keller ("Keller Decl.") ¶¶ 15-17. In July 2019, DOC had 309 nurses on staff to serve 13,320 prisoners, or one nurse for every 43 prisoners; it employed one doctor or physician's assistant for every 579 prisoners.[26] In February of this year, 139 healthcare positions were vacant out of 843 budgeted.[27] DOC medical staff have themselves spoken publicly about the possibility of systemic failure.[28]

---

[23] Eliza Fawcett & Steven Goode, *State Department of Correction Moves Inmates with COVID-19 to Northern Correctional Institution, Though Quarantine Questions Persist*, Hartford Courant (Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html.

[24] *See, e.g.*, David Cloud & Brie Williams, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional* Settings (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf; Elizabeth Weill-Greenberg, *Prisoners Who Test Positive for COVID-19 in Connecticut Are Sent to a Notorious Maximum Security Prison*, The Appeal (May 8, 2020), https://theappeal.org/connecticut-covid-19-prison-quarantine-northern-correctional-institution/.

[25] Rollin Cook, All-Staff Memo Re: Mass Testing for the novel coronavirus (May 12, 2020), https://portal.ct.gov/-/media/DOC/Pdf/Coronavirus-3-20/All-Staff-Memo-re-COVID19-Mass-Testing-051220.pdf?la=en.

[26] Jenna Carlesso & Kelan Lyons, *One Year after DOC Took Over Inmate Healthcare, Troubles Persist*, Conn. Mirror (July 2, 2019), https://ctmirror.org/2019/07/02/one-year-after-doc-took-over-inmate-healthcare-troubles-persist.

[27] Lisa Backus, *Staffing Shortage Creates 'Dangerous' Situation in CT Prisons*, Conn. Post (Feb. 3, 2020), https://www.ctpost.com/local/article/Staffing-shortage-creates-dangerous15027264.php.

[28] Eliza Fawcett, *With COVID-19 Threat Looming, State Prisons and Jails Are on Edge*, Hartford Courant (Mar. 28, 2020), https://www.courant.com/coronavirus/hcnews-coronavirus-connecticut-prisons-20200328-pvg57sfcafh5zck4wftabooxrestory.html.

Given the numerous inadequacies in Respondents' COVID-19 response, Mr. Diaz cannot safely remain physically confined in any DOC correctional institution. The only forms of housing available to DOC inmates are congregate housing or solitary confinement, each of which pose unique dangers for Mr. Diaz.

Finally, there is no question that Respondents have the authority to release Mr. Diaz, and that doing so would support Respondents' priorities. On March 24, 2020, Respondent Cook issued a press release relating to individuals prioritized for release, in which he stated that the agency would release eligible offenders working within existing policy and release mechanisms to create additional bed space under its statutory authority.[29] He further stated that DOC's Community Release Unit (CRU) and Parole and Community Services Division (PCS) and the Board of Pardons and Paroles (BOPP) were working collaboratively to identify eligible offenders with a solid home plan for release.[30] On or around April 6, 2020, Governor Lamont indicated at a press conference that the state would focus on releasing, among others, those held for "minor probation-related issues" and those who have solid home plans.[31] Mr. Diaz is held for a technical parole issue and has a solid home plan. Rivera Decl. ¶ 10. Nevertheless, DOC and BOPP have to date refused to release Mr. Diaz or to transfer him to home confinement, despite requests that they do so.

### IV.    Mr. Diaz is particularly vulnerable to COVID-19 due to his mental illnesses and intellectual disability.

---

[29] Press Release, Conn. Dep't of Corr., The Department of Correction Continues Essential Operations while Managing Reentry Planning and Routine Offender Releases without Disruption (Mar. 24, 2020), https://portal.ct.gov/-/media/DOC/Pdf/Coronavirus-3-20/Press-Release-DOC-reentry-032420.pdf?la=en.
[30] *Id.*
[31] Press Release, Ned Lamont, Governor, State of Conn., Governor Lamont Provides Updates on Connecticut's Response Efforts (Apr. 6, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/04-2020/Governor-Lamont-Coronavirus-Update-April-6.

Mr. Diaz is particularly vulnerable to COVID-19 due to his mental illnesses and intellectual disability.Mr. Diaz suffers from multiple severe psychiatric conditions—including PTSD, major depressive disorder, intellectual disability, and ADHD. Exhibit A to Habeas Petition, Dkt. 2 at 15. The onset of the COVID-19 pandemic has further triggered or exacerbated many of Mr. Diaz's PTSD and depression symptoms. He experiences suicidal ideation, hypervigilance, paranoia, difficulty sleeping, and increased anxiety. Diaz Decl. ¶¶ 12, 13. Mr. Diaz's chronic mental health conditions make him particularly vulnerable to harm, Keller Decl. ¶ 18, and can contribute to immunosuppression, placing him at an increased risk of infection and developing serious illness. Keller Decl. ¶ 28.

Mr. Diaz was born in 1993 in Hartford, Connecticut. Diaz Decl. ¶ 1. He grew up in an unstable and unsafe household environment. At an early age, he and his siblings frequently witnessed his father, José, physically abusing his mother and other women. *Id.* ¶ 3. When his parents separated, they would regularly pass Mr. Diaz off to one another and to other family members—often multiple times a year. *Id.* ¶ 2 Mr. Diaz was physically and verbally abused by his father, who was especially violent when Mr. Diaz went to live with him in Puerto Rico during his early adolescence. Declaration of Odette Rivera ("Rivera Decl.") ¶ 5. Mr. Diaz endured severe physical and emotional trauma from his father's abuse. José whipped Mr. Diaz with a metal belt buckle. Diaz Decl. ¶ 3 His father also verbally abused Mr. Diaz, and would tell him that he was "retarded and crazy," locking him in his room for extended periods. Rivera Decl. ¶ 5. Mr. Diaz endured severe physical and emotional trauma from his father's abuse. Mr. Diaz began self-harming by cutting himself in an effort to cope with his feelings of frustration and hopelessness brought on by his father's abuse. *Id.* ¶ 6.

Mr. Diaz's childhood abuse is linked to and exacerbates his mental health challenges. A systematic review of 124 studies found robust evidence that physical and emotional abuse increases a child's likelihood of having depressive disorders, anxiety disorders, and suicidal ideation—physical abuse, in particular, was strongly correlated with childhood behavioral and conduct disorders.[32] Early exposure to domestic violence further compounds these effects.[33]

Mr. Diaz has struggled with an intellectual disability and mental health issues—including anxiety, depression, PTSD, and ADHD—from a young age. Dkt. 2, Exh. A at 5. In first grade, Mr. Diaz was assessed as having special education needs, and his high school Individualized Education Program confirmed that he had learning disabilities and was eligible for special education programming. Declaration of Madeline Silva ("Silva Decl.") ¶ 2, Exh. B. Educational and health professionals recognized Mr. Diaz's intellectual limitations and mental health struggles when he was a child. Around the age of 10 to 12, he began receiving mental health services through a licensed social worker at Windsor Public Schools. Diaz Decl. ¶ 4. Soon after, Mr. Diaz was diagnosed with ADHD and PTSD. Silva Decl. ¶ 3, Exh. C. Records from Mr. Diaz's high school demonstrate that he has learning and intellectual disabilities as well as OHI-ADD/ADHD. Silva Decl. ¶ 2, Exh. B. In a psychiatric evaluation this year, Mr. Diaz was diagnosed with major depressive disorder, PTSD, mild intellectual disability, and ADHD. Dkt 2, Exh. A at 3.

Unfortunately, because Mr. Diaz frequently moved between family members and different schools, he did not receive the necessary medical attention to address his various mental illnesses. Mr. Diaz experienced an especially acute lack of mental health support when he moved to Puerto

[32] Rosana E. Norman et al., *The Long-Term Health Consequences of Child Physical Abuse, Emotional Abuse, and Neglect: A Systematic Review and Meta-Analysis*, 9 PLoS Med. 1, 21 (2012).
[33] Todd I. Herrenkohl et al., *Intersection of Child Abuse and Children's Exposure to Domestic Violence*, 9 Trauma, Violence & Abuse 84, 90-91 (2008).

Rico to live with his father from the ages of 12 to 16, when his father's abuse was at its most extreme and Mr. Diaz needed support the most. Rivera Decl. ¶ 5.

Mr. Diaz is imprisoned based on violations of a term of special parole, Conn. Gen. Stat. § 54-125e, after convictions for unlawful restraint 2nd degree and threatening 2nd degree, Conn. Gen. Stat. § 53a-96, §53a-62. He has been in DOC custody since December 9, 2019. In April 2019, Mr. Diaz had a final revocation hearing and was found to have violated the terms of his special parole by violating his GPS monitoring agreement, failing to return to his parole-approved residence, and failing to attend mental health treatment and problem sexual behavior group sessions. He was sentenced to six months' incarceration. Silva Decl. ¶ 4, Exh. D. He is scheduled to be released on June 9, 2020. Mr. Diaz has been on special parole since February 2, 2018. He has faced two prior revocation proceedings, neither of which were for any criminal conduct. Diaz Decl. ¶ 10.

A psychiatric evaluation conducted this year concluded that "[f]urther incarceration for Mr. Diaz would be detrimental to his mental health." Dkt. 2, Exh. A at 4. Mr. Diaz's imprisonment exacerbates mental health symptoms and prevents him from accessing the support and structure he needs to manage those symptoms. "[I]ncarceration and separation from family members exacerbates Mr. Diaz's symptoms of Major Depressive Disorder," which can include "recurrent thoughts of death." *Id*. at 18.

Imprisonment also worsens the symptoms of Mr. Diaz's PTSD. *Id*. at 18-19. Mr. Diaz has a history of self-harm and a suicide attempt while incarcerated, which illustrates how his mental health symptoms are impacted by incarceration. *Id*. at 13. Moreover, as Mr. Diaz has trauma rooted in physical abuse, being in an environment in which he feels perpetually unsafe is likely to be particularly toxic for his mental state. These effects are compounded by the fact that Mr. Diaz

reports having been sexually assaulted while at Osborn in August 2017, which has drastically increased his levels of stress and fear during his current stay at the same facility. *Id*. at 6; Diaz Decl. ¶ 12. Mr. Diaz has already displayed worsened symptoms of both disorders during periods of incarceration. Dkt. 2, Exh. A at 18-19.

The onset of the COVID-19 pandemic has further triggered or exacerbated many of Mr. Diaz's PTSD and depression symptoms. He experiences suicidal ideation, hypervigilance, paranoia, difficulty sleeping, and increased anxiety. Diaz Decl. ¶¶ 12-13, 16-17, 22, 26. Due to the onset of COVID-19, Mr. Diaz's block was quarantined for two weeks, during which time he was locked in his cells for 24 hours a day and was not allowed to leave his cell for any reason. *Id.* ¶14. He was not permitted to make phone calls to his family or take a shower, and staff did not clean inmates' cells. *Id*. On Monday, May 11, the quarantine was temporarily lifted, and inmates in Mr. Diaz's block were let out of their cells for 45 minutes a day for showers, phone calls, as well as to pick up their meals. *Id.* ¶ 15. When he was allowed out of his cell block, he was let out with half his block, during which time everyone is crowded together and unable to safely socially distance. *Id.* ¶ 20.

Mr. Diaz's block was put back into quarantine on Thursday, May 14. *Id*. They are now allowed to leave their cells for just 15 minutes a day. *Id.* ¶ 15. Mr. Diaz and his fellow inmates share telephones, which are not sanitized between uses. *Id.* ¶ 20. He shares a bunkbed with his roommate, making it impossible for him to maintain six feet from his bunk-mate, exacerbating Mr. Diaz's anxiety. *Id.* ¶ 17. This proximity is further triggering for Mr. Diaz because it reminds him of his childhood abuse and of the sexual assault he experienced at Osborn. *Id.* ¶ 16.

Since Mr. Diaz was placed in quarantine, he has been unable to access the medications he relies on to manage his PTSD and anxiety. *Id.* ¶ 21. He experiences panic attacks about twice a

week, during which time his chest hurts and he begins to feel nauseous and lightheaded. *Id.* ¶ 22.

He requested his medications from staff but did not hear back for more than two weeks. *Id.* at ¶

21. When he did get a response, he was told he would not be able to access medication because of

his June 9 release date. *Id.*

Mr. Diaz could be released to the Hartford home of his mother, Odette Rivera. Rivera

Decl. ¶ 10. He could self-quarantine in Hartford for as long as necessary. With the proper treatment

and environment, Mr. Diaz would be able to follow social distancing and containment guidelines

safely and appropriately. Mr. Diaz is in regular contact with his mother and siblings, who serve as

vital sources of emotional support to him and have experience helping him with his mental health

challenges. Diaz Decl. ¶ 24.

## ARGUMENT

### I.     Standard of Review

The standards for granting a temporary restraining order ("TRO") are the same standards

that govern preliminary injunctions. *See Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v.*

*New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Maxum Petroleum, Inc. v.*

*Hiatt*, No. 3:16-CV-01615 (VLB), 2016 WL 5496283, at *1 (D. Conn. 2016); *Andino v. Fischer*,

555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). For a preliminary injunction, a plaintiff "must

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Second Circuit has understood the *Winter* test to require a showing of "(a)

irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious

questions going to the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). Mr. Diaz meets all four *Winter* factors and also presents "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.* This Court should therefore grant his TRO motion.

## II.  Mr. Diaz faces irreparable harm if he continues to be incarcerated.

The threat of irreparable harm to Mr. Diaz is immense due to his psychiatric conditions. Irreparable harm is the threshold requirement for the granting of a TRO. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Furthermore, "the Second Circuit has deemed the threshold showing of 'irreparable harm' to be of particular significance under Rule 65, regardless of the strength of the movant's case on the merits." *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002).

Substantially increased risk of serious illness, chronic health issues, and death always constitutes irreparable injury. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) ("[T]he obvious potential for such issues as developing chronic health issues or spreading contagious diseases underscores the need for equitable relief . . . ."). Harm is irreparable when money damages after the matter is resolved will not be adequate redress. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Here, no amount of damages could make Mr. Diaz whole if he dies a preventable death while in custody. Furthermore, alleged violations of constitutional rights, such as those made

here by Mr. Diaz, amount to irreparable injury. *See, e.g.*, *Conn. Dep't Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

Other federal courts around the country have found the threat posed by the COVID-19 pandemic to constitute irreparable injury for the purposes of TROs and preliminary injunctions. *See Wilson*, No. 2020 WL 1940882, at *9 ("[I]t is more than mere speculation that the virus will continue to spread and pose a danger to inmates if BOP does not increase its efforts to stop the spread. Petitioners have therefore shown a risk for irreparable harm.");*Castillo v. Barr*, No. CV 20-00605, at *5-6 (C.D. Cal. Mar. 27, 2020) (finding that petitioners should be released from immigration custody because they established irreparable harm stemming from risk of exposure to COVID-19); *Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, [COVID-19] infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020) ("Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, . . . Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable."); *L.O. v. Tsoukaris*, No. CV 20-3481, 2020 WL 1808843, at *8 (D.N.J. Apr. 9, 2020) (concluding "Petitioners have demonstrated irreparable harm should they remain in confinement" because "[w]ith the conditions as currently described, at-risk detainees—including Petitioners—cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene . . . ."); *Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850, at *6 (N.D. Cal. Apr. 9, 2020) (concluding petitioner "ha[d] shown the likelihood of

irreparable injury to his health and safety" because "he is at heightened risk [due to] COVID-19").

Mr. Diaz is at a high risk of suffering irreparable harm if he remains incarcerated. Given the extreme risk of uncontrolled COVID-19 spread in the prison system and Mr. Diaz's high degree of susceptibility, waiting for a final resolution to this petition is untenable. His increased risk from COVID-19 due to his PTSD and major depressive disorder places him at unjustifiable risk of harm. Further, Mr. Diaz's current conditions of confinement in light of COVID-19 greatly exacerbate his mental health symptoms; near total confinement to his cell has prompted daily panic attacks, triggered nightmares about past traumatic events, and caused Mr. Diaz to feel increasingly depressed. Should Mr. Diaz contract COVID-19, he is likely to be transferred to isolated confinement at Northern Correctional Institution or be subject to medical "isolation" at Osborn. Such confinement would further undermine Mr. Diaz's mental health and likely prompt him to experience suicidal ideation and to self-harm by cutting himself, as he has done when placed in segregated confinement on prior occasions. With each passing day, his increased risk of exposure to COVID-19 and the exacerbation of the symptoms of his PTSD and major depressive disorder make irreparable harm more and more difficult to avoid. This risk of irreparable injury is readily avoidable through Mr. Diaz's release or transfer to home confinement.

### III. Mr. Diaz is substantially likely to succeed on the merits of his claims.

Mr. Diaz has suffered violations of his statutory and constitutional rights. Respondents have have failed to accommodate his disabilities in their refusal to release him to a safe environment. Moreover, they have acted with deliberate indifference to his medical needs,

placing him in danger as a result of their inadequate response to his high risk from COVID-19.

Mr. Diaz is likely to succeed on the merits of his ADA and Eighth Amendment claims.

**A. Respondents have discriminated against Mr. Diaz on the basis of his disability in violation of the ADA.**

Mr. Diaz suffers from a number of psychiatric conditions including post-traumatic stress disorder (PTSD), Intellectual Disability, major depressive disorder, and attention deficit hyperactivity disorder. Dkt. 2, Exh. A at 3. These conditions are mental impairments that substantially limit major life activities, and are thus disabilities under the ADA. 42 U.S.C. § 12102(1). Mr. Diaz's disabilities, and the corresponding increased risk from COVID-19, give him a substantial likelihood of success on the merits of his claim under Title II of the ADA that Respondents have failed to make reasonable accommodations by, *inter alia*, failing to release him from Osborn CI.

Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities by depriving them of the opportunity to participate in the services, programs, or activities of the public entity because of their disabilities. 42 U.S.C. § 12132. An individual establishes a prima facie violation of Title II of ADA by showing that: (1) he is a qualified individual with a disability; (2) the defendant is an entity subject to the acts; and (3) the plaintiff was denied the opportunity to participate in or benefit from the entity's services, programs, or activities or the entity otherwise discriminated against him by reason of his disability. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). Discrimination under Title II of the ADA can take the form of "(1) intentional discrimination (disparate treatment); (2) disparate impact of facially nondiscriminatory treatment; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). An individual must show that the public entity has failed to provide meaningful access to a

benefit it offers. *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 198-99 (2d Cir. 2014).

Mr. Diaz's medical conditions qualify as disabilities under the ADA in that they substantially limit major life activities, including learning, reading, concentrating, sleeping, thinking, communicating, and caring for oneself. *See* 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(i). Federal regulations clarify that intellectual disability and emotional or mental illness "easily" fall under the ADA. 29 C.F.R. § 1630.2(h), (j). Specifically, "it should easily be concluded that . . . an intellectual disability . . . substantially limits brain function" and "major depressive disorder . . . [and] post-traumatic stress disorder . . . substantially limit brain function." 29 C.F.R. § 1630.2(j)(3)(iii). In fact, psychiatric conditions such as intellectual disability, depression, and PTSD are precisely the types of disabilities contemplated by Congress when it passed the ADA Amendments Act of 2008. *See* Joint Hoyer-Sensenbrenner Statement on the Origins of the ADA Restoration Act of 2008, H.R. 3195 (section 1630.2(J)(1)(VII) "is intended to reject the reasoning of court decisions concluding that certain individuals with certain conditions—such as epilepsy or post traumatic stress disorder—were not protected by the ADA because their conditions were episodic or intermittent"); *see also* 76 Fed. Reg. 16978, 16987 (explaining Congress's motivation to expand coverage of the ADA to include impairments such as intellectual disabilities and major depression).

Title II of the ADA applies to DOC, as "[s]tate prisons fall squarely within the statutory definition of 'public entity'" under the ADA. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also Torrez v. Semple*, No. 3:17-CV-1232, 2018 WL 2303018, at *7 (D. Conn. 2018) ("The Supreme Court has held that Title II of the ADA is applicable to state prisons."); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 337 n.37 (D. Conn. 2015) ("Both

the ADA and the Rehabilitation Act apply to inmates housed in state prisons."); *Riddick v. Dep't of Corr.*, No. 3:13-CV-656, 2013 WL 6118354, at *3 (D. Conn. 2013) ("The State of Connecticut and the Connecticut Department of Correction are public entities within the meaning of the ADA.").

Respondents have failed to make reasonable accommodations for Mr. Diaz such that, under these circumstances, his disabilities render the conditions of his custody unreasonably dangerous to him. Mr. Diaz's disabilities put him at severe risk in prison. Individuals with mental health conditions are "particularly vulnerable to the harms of coronavirus." Keller Decl. ¶ 18. Conditions in prison are causing Mr. Diaz's PTSD symptoms to worsen significantly, as he is forced to stay in his cell for almost 24 hours a day and lacks access to the mental health care services that he requires. Diaz Decl. ¶¶ 15, 21; *see also* Keller Decl. ¶¶ 22, 25 . Under current conditions at Osborn, an individual with Mr. Diaz's diagnoses is likely to experience an even more dangerous worsening of symptoms, including increased risk of suicidal ideation. Keller Decl. ¶¶ 18, 22, 25.Mr. Diaz's past experiences of traumatization at Osborn in 2017 further increase the risk of self-harm and other symptoms associated with trauma. Keller Decl. ¶¶ 20-22. Respondents are statutorily required to accommodate Mr. Diaz's disability by offering him programming and treatment to manage his PTSD symptoms, but have denied him access to the services he is entitled to since the advent of COVID-19, and have denied him access to prescribed medication. Diaz Decl. ¶ 21. The urgency and dangerousness of Mr. Diaz's confinement cannot be overstated—he has, since the COVID-19 pandemic began, experienced heightened symptoms of his psychiatric conditions including trouble sleeping and night terrors. Diaz Decl. ¶ 13. His cell block was additionally placed on quarantine, resulting in his constant confinement in his cell—a situation that has made him feel "overwhelmed and trapped," an "incredibly triggering" experience. Diaz Decl. ¶ 16.

The only viable accommodation for Mr. Diaz's disabilities at this juncture is release from physical confinement; there is no DOC facility to which he could be transferred that would appropriately mitigate the significant health risks posed by COVID-19. Osborn's purported attempt to mitigate risks posed by COVID-19 has caused psychological harm and denial of basic hygiene to Mr. Diaz. Even now, Mr. Diaz is in constant confinement in a single cell in close quarters with his bunkmate. Diaz Decl. ¶ 17. Such isolation tactics have worsened his symptoms, *Id.* ¶ 22, without reducing his risk of exposure given his close proximity to a bunkmate and contact with individuals in his block. *Id.* ¶¶ 17, 19. Additionally, any further interventions taken by DOC will necessarily require imposition of conditions of solitary confinement or isolation, which DOC has used as a strategy for mitigating COVID-19 risk for other inmates. These interventions would further result in serious harm to someone of Mr. Diaz's debilitating depression and PTSD. Keller Decl. ¶¶ 23-25. Solitary confinement would also not substantially reduce his risk of exposure to the virus, given high rates of correctional staff infection and continued use of communal spaces. Respondents have the authority to release Mr. Diaz to a safe home environment through a variety of discretionary release mechanisms, but Mr. Diaz remains incarcerated nonetheless.

The requested relief under the ADA would not pose significant health and safety risks to others. *See* 42 U.S.C. § 12182(b)(3); *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 (1987) (holding that a person who poses a significant risk to others is not "otherwise qualified" for the activity). There can be no legitimate penological interest in keeping a vulnerable person such as Mr. Diaz incarcerated, risking exposure to a fatal infection. *Cf. Gates v. Rowland*, 39 F.3d 1439, 1446-47 (9th Cir. 1994). Thus, Mr. Diaz is likely to succeed on the merits of his ADA claim.

**B. Respondents have exhibited "deliberate indifference" towards Mr. Diaz's medical needs in violation of the Eighth Amendment.**

With COVID-19 spreading rapidly through Osborn CI while Mr. Diaz is kept in conditions that place him at significant risk of contracting the illness, Mr. Diaz's fact of confinement constitutes cruel and unusual punishment. By failing to abate the risks he faces from COVID-19—both in terms of contracting the virus and in exacerbating his mental health conditions—Respondents are deliberately indifferent to Mr. Diaz's serious medical needs in contravention of the Eighth Amendment. When he was sentenced to six months of imprisonment for non-criminal conduct, he could not lawfully have been sentenced to suffer what Respondents are causing upon him today.

The Eighth Amendment's ban on cruel and unusual punishment safeguards the rights of prisoners while in state custody. Under the Eighth Amendment, the Government has an affirmative duty to provide conditions of reasonable health and safety to those in its custody. *DeShaney v. Winnebago County Dep't Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). This affirmative duty includes the obligation to provide adequate care to inmates with acute medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Mental health needs are among those protected by the Eighth Amendment. *See, e.g.*, *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care [for purposes of the Eighth Amendment]."); *Young v. Choinski*, 15 F. Supp.3d 172, 184 (D. Conn. 2014) (collecting cases).

To prove that the Government breached its duty to provide conditions of reasonable health and safety to those in its custody, a petitioner must show that prison authorities exhibited "deliberate indifference" to his or her medical needs. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir.

2003). The "deliberate indifference" test requires that a petitioner prove (1) "that his medical condition is objectively a serious one" and (2) "that the defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Id.*

Mr. Diaz's PTSD, major depressive disorder, intellectual disability, and ADHD satisfy the standard required to show an objectively serious medical need. The Second Circuit has considered a variety of factors in determining whether a medical condition is objectively serious. That "non-exhaustive" set of factors includes (1) "whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain.'" *Brock*, 315 F.3d at 162. Even before the COVID-19 outbreak, Mr. Diaz had medical conditions significant enough to meet the *Brock* standards based on his psychiatric conditions. A recent psychiatric evaluation concluded that Mr. Diaz suffers from PTSD, major depressive disorder, and ADHD, which would benefit from medication and therapy, Dkt. 2, Exh. A, rendering them conditions "important and worthy of comment or treatment." *Brock*, 315 F.3d at 162. That evaluation also emphasized that, in light of his intellectual disability, Mr. Diaz would benefit from support from mental health professionals and family members in order to develop positive coping skills, indicating that his intellectual disability "significantly affects [his] daily activities." *Id.* Further, BOPP and Parole and Community Services (PCS) have required Mr. Diaz to participate in mental health treatment as a condition of his parole release, thereby recognizing his mental health needs as worthy of treatment. Silva Decl. ¶ 4, Exh. D. These medical needs are substantial enough to meet the "objectively serious" prong of the Eighth Amendment inquiry.

In light of the COVID-19 pandemic, Mr. Diaz's underlying risk factors constitute objectively serious medical needs for additional reasons. First, his conditions put him at high risk of contracting COVID-19. Keller Decl. ¶ 18. In particular, the symptoms of Mr. Diaz's PTSD and major depressive disorder make him particularly vulnerable to the harms of COVID-19. *Id.* ¶¶ 18, 20, 22. Further, even if Mr. Diaz does not contract COVID-19, the current stressors at Osborn surrounding the response to the virus drastically increase his acute mental health symptoms, including anxiety, depression, insomnia, and hypervigilance. Diaz Decl. ¶ 13, 16, 17, 22, 24; Keller Decl. ¶¶ 23-25.

Mr. Diaz need not wait to contract COVID-19 to establish a constitutional claim, as the Eighth Amendment's "deliberate indifference" inquiry also specifically encompasses the risk of *future harm* in its analysis. In *Helling v. McKinney*, the Supreme Court held that a prisoner's exposure to second-hand smoke constituted a viable Eighth Amendment claim, even before contracting any second-hand-smoke related illness. 509 U.S. at 35; *see also id.* at 33-34. Nor may prison officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33. In Mr. Diaz's case, that possibility of serious mental health consequences, illness, or death grows each day he spends incarcerated – particularly when there is an outbreak of COVID-19 on his block but he is unable to practice basic hygiene and social distancing. Further, should Mr. Diaz contract COVID-19, he would be transferred to isolated confinement at Northern CI or placed in isolation at Osborn.[34] Transfer to isolated confinement would almost certainly worsen Mr. Diaz's already poor mental health, given his history of self-harm and a suicide attempt while in segregated confinement. Dkt. 2, Exh. A at 13.

---

[34] Rollin Cook, All-Staff Memo Re: Mass Testing for the Novel Coronavirus (May 12, 2020), https://portal.ct.gov/-/media/DOC/Pdf/Coronavirus-3-20/All-Staff-Memo-re-COVID19-Mass-Testing-051220.pdf?la=en.

An individual who has established a serious medical need must next show that prison officials "acted with deliberate indifference to [the plaintiff's] medical needs." *Brock*, 315 F.3d at 162; *see also Estelle*, 429 U.S. at 104. To do so, one must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 137 (2d. Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). A prisoner need not show that an official acted "for the very purpose of causing harm," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), but must show that an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it," *Harrison*, 219 F.3d at 137 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). The Supreme Court has directed lower courts to consider "prison authorities' current attitude and conduct" and existing preventative policies to determine whether officials are deliberately indifferent to medical needs. *Helling*, 509 U.S. at 36 (directing the court of appeals, on remand, to evaluate the plaintiff's Eighth Amendment claim in light of a new smoking policy put in place in the course of the litigation).

Respondents are aware of and recklessly indifferent to the grave threat COVID-19 presents to Mr. Diaz's physical and mental health. Respondents allow groups of men from Mr. Diaz's block out at the same time each day for phone calls, and meal pick-up, with no social distancing measures. Diaz Decl. ¶ 19. Respondents have failed to provide Mr. Diaz with access to hand sanitizer or gloves and provide him only one mask each week. *Id.* ¶ 18. Respondents have also confined Mr. Diaz to a cellmate from whom he cannot properly socially distance, including at night, when they sleep in bunk beds. *Id.* ¶ 17. Respondents' failure to adequately respond to COVID-19 doubly affects Mr. Diaz; it exacerbates the symptoms of his PTSD, major depressive disorder, and ADHD to the point of causing increasing anxiety (including daily panic attacks), paranoia, and insomnia. *Id.* ¶¶ 13, 16, 22, 24. On top of all this, Respondents have refused Mr.

Diaz's written requests for his anxiety and mental health medications, which he submitted after his unit's placement in quarantine caused his mental health symptoms to worsen. *Id.* ¶ 21. Respondents know Mr. Diaz is in their care, yet continue to "fail[] to take reasonable measures" to mitigate the risk he faces. *Farmer*, 511 U.S. at 847.

Current DOC policies that are meant to slow the spread of COVID-19 will fail to meaningfully keep inmates like Mr. Diaz from harm's way. Prison layouts are largely incompatible with social distancing given shared cells, showers, and communal food preparation. Gonsalves Decl. ¶ 21. Respondents have also lagged in releasing currently incarcerated inmates, a necessary step to ensure that inmates and correctional officers left behind can effectively social distance.[35] Finally, Respondents' health care system is grossly inadequate. The available data indicate a severe shortage of doctors and nurses on staff: one nurse for every 43 prisoners, and one doctor or physician's assistant for every 579 prisoners.[36] Medical staff at Osborn have also raised public concerns about staffing shortages themselves.[37]

Subjecting prisoners to the rapid spread of COVID-19 is also not "reasonably related to legitimate penological interests"; this Court therefore does not owe the ordinary deference to Respondents' judgment to imprison Mr. Diaz under these conditions. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Even assuming some form of deference to DOC policies should apply in this context, "[t]he fact that initial responsibility for . . . prisons is vested in prison administrators 'does

---

[35] Kelan Lyons, *Shifting Plans and a COVID-19 Outbreak at a Connecticut Prison*, CT Mirror (Apr. 17, 2020), https://ctmirror.org/2020/04/17/shifting-plans-and-a-covid-19-outbreak-at-a-connecticut-prison ("There were 1,022 fewer people in state jails and prisons on April 17 than March 1, primarily because there are fewer people entering the criminal justice system.").

[36] Jenna Carlesso & Kelan Lyons, *One Year After DOC Took Over Inmate Healthcare, Troubles Persist*, Conn. Mirror (July 2, 2019), https://ctmirror.org/2019/07/02/one-year-after-doc-took-over-inmate-healthcare-troubles-persist.

[37] Kelan Lyons, *Elderly Prisoners in Connecticut Vulnerable to Potential Coronavirus Outbreak*, CT Mirror (Mar. 11, 2020) https://www.courant.com/coronavirus/hc-pol-coronavirus-connecticut-prisons-20200311-ote3jd6orje77ipl44qgi3bb6i-story.html.

not mean that constitutional rights are not to be scrupulously observed.'" *Block v. Rutherford*, 468 U.S. 576, 594 (1984) (Blackmun, J., concurring) (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)). As other federal courts have recognized, deference is not a blank check to violate constitutional rights by failing to contain and adequately safeguard inmates from the rapid spread of COVID-19. *See, e.g.*, *Wilson*, No. 2020 WL 1940882, at *2 (acknowledging the "good efforts" by BOP to try to limit the virus's spread, but declining to defer to BOP judgment and granting a preliminary injunction mandating immediate release);

Mr. Diaz is a young man with PTSD, major depressive disorder, intellectual disability, and ADHD, whose symptoms are exacerbated by the conditions in which Respondents hold him. He remains incarcerated while a pandemic spreads through Connecticut prisons like wildfire. The unconstitutionally dangerous conditions at Osborn have already led to the illness—and death—of prisoners. Respondents know that Mr. Diaz is especially at risk of contracting COVID-19, and that continued confinement during this pandemic will greatly exarcerbate his mental health symptoms. The Eighth Amendment bars this imminent, deadly exposure to COVID-19; Mr. Diaz is therefore highly likely to succeed on the merits of his claim.

### C. Exhaustion of state court remedies is not required because it would be futile.

Exhaustion of state court remedies would cause needless, potentially fatal delay; this Court should therefore excuse the requirement as futile.[38] Exhaustion under Section 2254 in state court should be excused because the state courts are functionally unavailable and because requiring exhaustion would expose Mr. Diaz to substantial risk of irreparable harm.[39]

---

[38] Another court in this district has determined that the type of claim that Mr. Diaz asserts is properly brought under Section 2241, which has no statutory exhaustion requirement. *McPherson v. Lamont,* --- F.Supp.3d ---, No. 3:20-cv-534-JBA, 2020 WL 2198279, at *4 (D. Conn. May 6, 2020) (habeas petitions by state prisoners properly proceed under Section 2241).

[39] Mr. Diaz has exhausted all administrative remedies available to him, as he has sought release from imprisonment through counsel from both DOC and BOPP. Declaration of Patrick Liu ("Liu Decl.") ¶¶ 2-4, 6. In addition, his mother has asked for his release from Governor Lamont and DOC. Rivera Decl. ¶ 13.

*1. The statutory exceptions to exhaustion under 28 U.S.C. § 2254 apply.*

Section 2254(b)(1)(B) excuses exhaustion if "there is an absence of available State corrective process," or "circumstances exist that render such process ineffective to protect the rights of the applicant." *Id.* §§ 2254(b)(1)(B)(i)-(ii); *see also Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) ("An exception is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief."); *Lurie v. Wittner*, 228 F.3d 113, 123-24 (2d Cir. 2000) (confirming that the standard after the enactment of AEDPA "is substantially identical to the pre-AEDPA exhaustion standard" and that "[w]here there is no further state proceeding for petitioner to pursue, or where further pursuit would be futile, this Court can, in certain circumstances, address the merits of a habeas petition even if it contains unexhausted claims" (citations omitted)); *Washington v. James*, 996 F.2d 1442, 1449 (2d Cir. 1993) (recognizing "the statutory exception permitting non-exhaustion where recourse to state remedies is futile"); *Mercado v. Rockefeller*, 502 F.2d 666, 672 (2d Cir. 1974) (same).

The imperative to waive the exhaustion requirement due to futility is strongest when the "absence of state corrective process" is "attributable to the state, not to the petitioner." *Jumpp v. Cournoyer*, No. 3:15-CV-00892, 2016 WL 3647146, at *3 (D. Conn. 2016). This state-created procedural void can occur if "no corrective procedure at all exists to redress a particular constitutional violation" or if "a corrective procedure exists but 'the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process.'" *Francis S. v. Stone*, 995 F. Supp. 368, 379-80 (S.D.N.Y. 1998), *aff'd,* 221 F.3d 100 (2d Cir. 2000) (quoting *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977)).

The COVID-19 pandemic has rendered the state courts an ineffective avenue to protect Mr. Diaz's rights. The Connecticut Judicial Branch is operating at severely reduced capacity. According to its March 12, 2020 "Continuity of Operations Plan," it is scheduling and hearing only items considered "Priority 1 Business Functions."[40] Habeas petitions do not fall in this category, nor do any other mechanisms through which individuals in custody may challenge the legality of their confinement.[41] While the six operating Superior Courts have begun accepting non-Priority 1 civil filings via lockboxes in their lobbies, there has been no provision made for emergency filings.[42] Any open courthouses are operating at a significantly reduced capacity—they are now closed Tuesdays and Thursdays,[43] with reduced Wednesday and Friday hours.[44] And the most recent guidance on criminal matters does not provide vehicles for petitions from individuals on special parole, like Mr. Diaz.[45]

Connecticut General Statutes § 52-466 requires that a petition for a writ of habeas corpus be made to the Superior Court for the Tolland Judicial District, yet no courthouse is open in the Tolland Judicial District. This means any habeas petitions must be retrieved from the lockbox at the shuttered Rockford courthouse and transported to the Hartford courthouse, which is already under an increased load of functions deemed "Priority 1 Business." According to a 2019 report, even before the disruption caused by the COVID-19 crisis, state habeas corpus petitions took an

[40] State of Connecticut Judicial Branch, *COVID-19 Information from the Connecticut Judicial Branch* (Apr. 17, 2020), https://jud.ct.gov/COVID19.htm.
[41] *Id.*
[42] *Id.*
[43] State of Connecticut Judicial Branch, *Reduced Day of Operation at State Courthouses,* (Apr. 3, 2020), https://jud.ct.gov/HomePDFs/Reduced_Days_Courthouses.pdf.
[44] State of Connecticut Judicial Branch, *COVID-19 Information from the Connecticut Judicial Branch* (Mar. 26, 2020), https://jud.ct.gov/COVID19.htm.
[45] State of Connecticut Judicial Branch, Criminal Matters Continue Expanding its Capability to Handle Cases (May 13, 2020), https://jud.ct.gov/COVID19.htm.

average of three years to get to trial.[46] More than two thirds of those cases were in regards to medical concerns.[47] Indeed, there have been only three habeas petitions docketed in the entire state of Connecticut since March 1, 2020, when the pandemic began; under normal conditions, the court dockets an average of 50-60 such cases per month.[48] Given the urgent, life-threatening conditions brought on by the pandemic, there is simply no way an ordinarily overburdened system operating at substantially reduced capacity can provide an effective avenue for emergency relief. This functional closure of Connecticut courts constitutes an "absence of available State corrective process" through which Mr. Diaz can protect his rights. 28 U.S.C. § 2254(b)(1)(B)(i).

Exhaustion is also futile for the purposes of Section 2254 when inordinate delay renders state courts practically unavailable. *Mathis v. Hood*, 851 F.2d 612, 614 (2d Cir. 1988) (waiving exhaustion in light of "extraordinary delays which infect the system"); *Sapienza v. Vincent*, 534 F.2d 1007, 1010 (2d Cir. 1976) ("Inordinate delay in concluding its post-judgment criminal proceedings may preclude a state from relying on the exhaustion requirement to defeat Federal review."); *U.S. ex rel. Goodman v. Kehl*, 456 F.2d 863, 869 (2d Cir. 1972) ("An inordinate and unjustified delay in the state corrective process may well result in the frustration of petitioner's rights and be such a circumstance as to render that process ineffective, . . . and in such cases the exhaustion requirement will be deemed satisfied [under 28 U.S.C. 2254(b)]."); (internal citation and quotation marks omitted); *Riles v. Warden, State Prison*, No. 3:14CV1420, 2016 WL

---

[46] Judiciary Committee Habeas Corpus Matters Task Force, Meeting Minutes from Thursday, Sept. 18, 2019, available at https://www.cga.ct.gov/jud/tfs/20190729_Habeas%20Corpus%20Matters%20Task%20Force/20190918/9 -18-19%20Minutes%20of%20Habeas%20TF.pdf.

[47] State of Conn. Judicial Branch, Habeas Case Analysis (July 29, 2019) [hereinafter "Habeas Case Analysis"], available at https://www.cga.ct.gov/jud/tfs/20190729_Habeas%20Corpus%20Matters%20Task%20Force/20190717/ Habeas%20Case%20Analysis-Judicial%20Branch%20Statistics%20&%20Performance%20Mgmt..pdf; *see also id.* (detailing average times to disposition at trial, depending on type of case, ranging from 1,158 days to 1,299 days).

[48] *See McPherson v. Lamont*, 3:20-cv-00534-JBA, Declaration of Elizabeth Dolbeare, Dkt. No. 34-4 (May 3, 2020); *Id.*, Email from Kathryn Stackpole to Elana Bildner, Dkt. No. 34-5 (May 3, 2020); Habeas Case Analysis, *supra* note 47, (dividing average of new cases per year, 679, by 12 months).

1239220, at *3 (D. Conn. 2016) ("Inordinate and unjustified delay by the state in processing a habeas claim may render the state remedy ineffective."); *Swain v. Murphy*, No. 308-CV-1394, 2010 WL 1279051, at *2 (D. Conn. 2010) (same); *Cholewinski v. Armstrong*, No. 3:98CV1964, 2000 WL 303252, at *3 (D. Conn. 2000) ("[F]ederal courts have dispensed with the exhaustion requirement because of delay on the part of the state or manifest injustice to the petitioner.").

Excusal of exhaustion is especially warranted when delay would cause the petitioner to suffer "irreparable harm," as is the case for Mr. Diaz. *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371-72 (E.D.N.Y. 2005) (considering a habeas petition by a person whose total sentence was shorter than the time needed for administrative review); *Hill v. Mance*, 598 F. Supp. 2d 371, 375-76 (W.D.N.Y. 2009) (holding that "requiring exhaustion would cause irreparable injury to the petitioner's rights since undue delay in the state courts risks mooting the petitioner's federal rights before he reaches the federal courts" (internal citation and quotation marks omitted)); *cf. Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) ("[E]xhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice.").

As Judge Arterton summarized, "[g]iven the reality of the disease, which is spreading in Connecticut prisons, and the consequence of potentially catastrophic health outcomes, . . . exhaustion of state remedies would be futile, because, under current conditions, Plaintiffs are at substantial risk of contracting the disease prior to completing the exhaustion process." *McPherson v. Lamont,* No. 3:20-cv-534-JBA, 2020 WL 2198279, at *7 (D. Conn. May 6, 2020) (holding prudential exhaustion under Section 2241 excused); *see also James*, 996 F.2d at 1449. Mr. Diaz is also at substantial risk of suffering irreparable injury before he could complete the exhaustion process, therefore warranting excusal under either prudential exhaustion or under 28 U.S.C. § 2254(b)(1)(B).

One court considering a plaintiff with medical vulnerabilities aptly observed that "delaying release amounts to denying relief altogether." *United States v. Perez*, No. 17 CR. 513-3, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (granting release where the plaintiff "had two surgeries while incarcerated, and continues to suffer severe side effects such as ongoing pain and persistent vision problems"). The plaintiff's "undisputed fragile health, combined with the high risk of contracting COVID-19 [while incarcerated for even a few weeks] justifies waiver of the exhaustion requirement." *Id.*; *see also New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) ("[E]nforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death."); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *3-4 (D. Conn. Apr. 8, 2020) (waiving exhaustion requirement in light of "potential for serious health consequences" to defendant due to COVID-19); *United States v. Zukerman*, No. 16 CR. 194, 2020 WL 1659880, at *2-4 (S.D.N.Y. Apr. 3, 2020) (considering a plaintiff who "is 75 years old and suffers from diabetes, hypertension and obesity" and holding that his "advanced age and compromised health, combined with the high risk of contracting COVID-19 [while incarcerated] justify waiver of the exhaustion requirement" given the "exigency of a rapidly advancing pandemic").

Given the functional unavailability of the state courts and the ongoing, inordinate delays in state court processes, "recourse to state remedies is futile." *James*, 996 F.2d at 1449. Under the current conditions, Mr. Diaz is also at substantial risk of suffering irreparable injury before he could complete the exhaustion process. This Court should therefore conclude that the statutory exceptions to exhaustion under Section 2254 apply. 28 U.S.C. §§ 2254(b)(1)(B).

**IV.      The equities and public interest weigh in favor of releasing Mr. Diaz.**

The equities and public interest factors, which "merge" when the government is the opposing party, favor Mr. Diaz's release for two reasons. *Coronel*, 2020 WL 1487274, at \*7 (citing *Planned Parenthood of New York City v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)). First, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Coronel*, 2020 WL 1487274, at \*7 (quoting *Sajous v. Decker*, 2018 WL 2357266, at \*13 (S.D.N.Y. 2018)); *see also Wilson*, 2020 WL 1940882, at \*10 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Given Respondents' ongoing violation of Mr. Diaz's constitutional rights, the public interest is best served by his release.

Second, courts have recognized the overwhelming "public interest" in releasing vulnerable individuals "in light of the rapidly-evolving public health crisis engendered by the spread of COVID-19." *Coronel*, 2020 WL 1487274, at \*8; *see also Grand River Enterprises Six Nations v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying "public health" as a "significant public interest"); *Thakker*, 2020 WL 1671563, at \*9 ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest."); *Tsoukaris*, 2020 WL 1808843, at \*9 ("Clearly the public has an interest in preventing the further spread of COVID-19. Prevention, among other things, preserves critical medical resources necessary to combat the pandemic."). Medical experts agree that prisons are hotbeds for the spread of COVID-19 and the *only* way to protect vulnerable prison populations and avoid overwhelming the hospital system as a whole is taking immediate steps towards decarceration. *See* Gonsalves Decl. ¶¶ 33-34.

Lastly, the government cannot justify continuing to incarcerate Mr. Diaz, given his disabilities. The most prudent course of action, both for his benefit and for public health overall,

is for the Court to order Mr. Diaz's release to a safe home environment where he can self-isolate and manage his psychiatric conditions, and will neither contract COVID-19 nor transmit COVID-19 to others.

## V. This Court has the equitable power to release Mr. Diaz while his habeas petition is pending.

This Court has the "inherent authority" to admit Mr. Diaz to bail and order his release pending the adjudication of his habeas petition. *Mapp v. Reno*, 241 F.3d at 226. This judicial power is also known as "enlargement," whereby a prisoner is physically but not legally released, remaining within DOC's custody but in a different location. *See, e.g.*, *Wilson*, 2020 WL 1940882, at *4. In other words, "[w]hen a court exercises its power to 'enlarge' the custody of a defendant pending the outcome of a habeas action, the [department of corrections] maintains custody over the defendant, but the place of custody is altered by the court." *Id.*

The Second Circuit has recognized that such an order is appropriate where the petitioner "raises substantial claims" and demonstrates that "extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 230 (quoting *Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir. 1980)); *see also Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978); *Gaymon v. Whidden*, No. 3:11-cv-805, 2011 WL 2078632 (D. Conn. 2011) (recognizing the existence of such power with respect to a petitioner seeking relief under 28 U.S.C. § 2254); *Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988) ("A federal court has the inherent power to release a state prisoner on bail pending resolution of his habeas petition.").

Mr. Diaz meets the *Mapp* factors and qualifies for immediate release or transfer to home confinement. First, he not only raises "substantial claims" in his habeas petition, but has demonstrated a substantial likelihood of success on the merits. *See supra* Section III; *see also*

*Gaymon*, 2011 WL 2078632, at *1 ("To satisfy the first part of the test, the petitioner must present merits that are more than slightly in petitioner's favor.") (internal quotation marks and citations omitted).

Second, the unique threat that COVID-19 poses to Mr. Diaz, given his mental health conditions, is an "extraordinary circumstance" that merits immediate release. Courts have recognized that "[s]evere health issues" are the "prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas." *Coronel*, 2020 WL 1487274, at *9. District courts have recognized that the unprecedented and extraordinary risk that COVID-19 poses to public health—especially in settings such as prisons where social distancing and containment are difficult or impossible—is such an "extraordinary circumstance" that it warrants the release of detained and incarcerated persons before ruling on the merits of their habeas petitions. *See, e.g.*, *id.*; *United States v. Nkanga*, 2020 WL 1695417, at *3 (S.D.N.Y. Apr. 7, 2020) (defendant's "age" and "multiple health issues" constituting "extraordinary circumstances" in light of COVID-19); *Hernandez v. Decker*, 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020) ("continued risk of exposure to COVID-19" constituting "extraordinary circumstances"); *Savino v. Souza*, ---F.Supp.3d---, 2020 WL 1703844, at *8-9 (D. Mass. Apr. 8, 2020) (acknowledging this "nightmarish pandemic" as constituting "extraordinary circumstances" justifying release under *Mapp*); *Ferreyra v. Decker*, No. 20 Civ. 3170, 2020 WL 1989417, at *12 (S.D.N.Y. Apr. 27, 2020) (risk of "severe illness or death" due to COVID-19 constituting "extraordinary circumstances"); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1953847, at *13 (S.D.N.Y. Apr. 23, 2020) (same).

Third, Mr. Diaz's release is "necessary to make the habeas remedy effective," because "the risks posed by COVID-19 are imminent." *Coronel*, 2020 WL 1487274, at *8-9. Keeping

Mr. Diaz incarcerated while adjudicating his petition would subject him to a "significant risk" of contracting COVID-19, "the very outcome [he] seek[s] to avoid." *Id.*; *see also Ferreyra*, 2020 WL 1989417, at *12; *Basank*, 2020 WL 1953847, at *13. Judges in the District of Connecticut have recognized that "catastrophic health consequences" will very possibly befall older and medically vulnerable individuals in prison if they remain incarcerated. *See, e.g.*, *United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (granting immediate release of a 65-year-old federal prisoner despite failure to exhaust administrative remedies). Immediate release is Mr. Diaz's only effective remedy.

Finally, this Court also has the equitable power to order the release of incarcerated persons where unconstitutional conditions are not corrected "within a reasonable time." *Rhem v. Malcolm*, 507 F.2d 333, 341 n.20 (2d Cir. 1974); *see also Brown v. Plata*, 563 U.S. 493, 511 (2011); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975). It has been nearly two months since President Trump declared a national emergency due to COVID-19.[49] During that period of time, Respondents have failed to address the rapid spread of COVID-19 and provide a safe environment for vulnerable individuals like Mr. Diaz. The "reasonable period of time" for Respondents to correct their ongoing, and potentially fatal, violation of Mr. Diaz's constitutional rights has come and gone. *Rhem*, 507 F.2d at 341 n.20. The District Court therefore has the power to release Mr. Diaz immediately beyond the physical confines of his custody at Osborn CI.

//

//

//

---

[49] Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).

## CONCLUSION

For the foregoing reasons, Mr. Diaz respectfully requests this Court issue a temporary restraining order enlarging his custody, or admitting him to bail, pending adjudication of his habeas petition.

Dated May 15, 2020

Respectfully submitted,

/s/ Marisol Orihuela
Veronica Guerrero, Law Student Intern*
Patrick Liu, Law Student Intern*
Phoenix Rice-Johnson, Law Student Intern*
Madeline Silva, Law Student Intern*
Rebecca Steele, Law Student Intern*
Megan Yan, Law Student Intern*
Marisol Orihuela, Supervising Attorney, ct30543
Jerome N. Frank Legal Svcs. Org.
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
marisol.orihuela@ylsclinics.org

*Counsel for Petitioner*
*Motion for Law Student Appearances
Forthcoming.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2020, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Respectfully submitted,

*/s/ Marisol Orihuela*
Marisol Orihuela