| JONATHAN DIAZ, #391080 | : | CIVIL NO. 3:20-cv-00653 (KAD) |
| *Petitioner,* | : | |
| | : | |
| v. | : | |
| | : | |
| ROLLIN COOK, *et al* | : | MAY 26, 2020 |
| *Respondents.* | : | |

## MEMORANDUM OF LAW IN OPPOSITION
## TO PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ENLARGEMENT OF CUSTODY

Jonathan Diaz, #391080, ("petitioner") is currently being held in Connecticut Department of Correction ("DOC") custody by order of the Connecticut Board of Pardons and Paroles ("Board" or "BOPP") as a Special Parole Commitment. This order has been executed by way of Special Parole Mittimus.[1] Petitioner has been ordered to a "Period of Confinement" until June 9, 2020, at which time his release to Special Parole supervision will resume by way of supervision in the community under the Department of Correction Parole and Community Services Division. ("PCS"). Petitioner's Special Parole end date is recorded as being February 1, 2021. Petitioner Diaz is not presently eligible for DOC community release based upon this order of incarceration by CT Board of Pardons and Paroles.[2]

The PCS Division of the DOC, not the Board, provides staff for field supervision and DOC employees who are parole officers, monitor parolees for compliance and enforce the Board's conditions through the use of graduated sanctions and—where necessary—arrest, (also known as "remand") return to custody, and charges of parole violation. See Conn. Gen. Stat. §§ 54-124c, 54-

---

[1] S*ee* **Exhibit 1**, Garibaldi Declaration, State of Connecticut Board of Pardons and Paroles Special Parole Mittimus; Exhibit J to Garibaldi Declaration; see also Sparaco Declaration**, Exhibit 2**, Exh. J attached thereto.

[2] Galligan Decl. **Exhibit 3**.

125e(a), 54-125e(b)(2), 54-126, 54-127.[3] The Board, through its Revocation and Rescission Unit determines whether the charged violations occurred and imposes sanctions for violations for the purposes of community safety, minimizing risk of flight from supervision and reoffending, deterring future violations, and providing for the rehabilitation of the parolee.[4]

In this case, Jonathan Diaz, #391080, has been found in violation of his conditions of special parole for similar conduct 3 times since he began serving his period of special parole in February of 2018.[5]

On March 27, 2020, the Board found Mr. Diaz in violation of the conditions of his special parole for removing his GPS tracking device without permission, absconding from and failing to return to his halfway house, failing to attend therapy sessions for mental health treatment, and failing to attend his behavioral management program for the treatment of problem sexual behavior.[6]

On April 23, 2020, the Board approved 6 months of imprisonment with credit for time served as a sanction for the violations and committed Mr. Diaz to the custody of the Department until June 9, 2020.[7] Thus, Mr. Diaz is presently scheduled to be reinstated to Special Parole in any event in two weeks, on June 9, 2020.

As a threshold matter, this Court should not hear Petitioner's claims as he has not exhausted his state court remedies. Currently Petitioner is in custody as a Special Parole violator under a Special Parole mittimus. And, although Petitioner claims this Court should review his Petition under § 2241,

---

[3] Sparaco Declaration ¶ 12
[4] *Id*. ¶13.
[5] *Id*. ¶18. See Declaration of Michelle DeVeau, **Exhibit 4,** and RT 60 attached thereto.
[6] *Id*. ¶24. A true and correct copy of the Revocation Hearing Summary is attached to Sparaco's Declaration as Exhibit H
[7] *Id.* ¶25. A true and correct copy of the Hearing Disposition is attached to Sparaco's declaration as Exhibit I and a true and correct copy of the Special Parole Commitment Mittimus is attached as Exhibit J.

this Court has already correctly determined this case to fall squarely under § 2254[8]. (Order to Show Cause, ECF Doc. #10 at 2)[9] Section 2254 specifically requires the Petitioner to fully exhaust any state court remedies prior to seeking relief in a federal court. See accompanying motion to dismiss, and memorandum of law. Petitioner specifically alleges that any failure to exhaust should be excused as futile. Pet. Memo at 29-30. However, petitioner is woefully misinformed about the activity in the state courts, especial habeas activity, including the use of three state court judges, Hon. Tejas Bhatt, Hon. Vernon Oliver, and the Hon. Hunchu Kwak, and also using two courthouses, the Rockville Courthouse in the J.D. of Tolland, and the Middletown courthouse in the Middlesex J.D. Petitioner is also woefully ill-informed about the extremely expedited schedules being imposed by the state habeas court and the number of emergency motions being filed based on the COVID-19 emergency. These details are set forth in the accompanying memorandum in support of the motion to dismiss, and in the Declaration of Kathryn Stackpole, **Exhibit 12**.

Petitioner's understanding of the rapid speed and expeditious handling by the state courts of such emergency motions for bond or release due to COVID-19 is totally lacking. Petitioner offers no competent evidence or valid excuse for his failure to take advantage of his state court remedies which have been available to him or that he has even made the attempt to engage such processes. He simply relies on his ill-informed understanding of what constitutes a Priority 1 matter in state court, and ignores the fact that at all times emergency motions for temporary restraining orders were and

---

[8] "Accordingly, when faced with a Section 2241 petition from a petitioner in state custody who challenges the execution of his sentence, it is proper for the district court to construe the petition as arising under Section 2254. *See Cook*, 321 F.3d at 278; *see also Musciotto v. Nardelli*, No. 3:19-CV-559 (KAD), 2019 WL 5086691, at *3 (D. Conn. Oct. 10, 2019) (construing petition filed under Section 2241 as governed by Section 2254 where petitioner was a state prisoner challenging a detainer lodged by another state, which the Court found tantamount to a challenge to the execution of his sentence)."

[9] This Court allowed petitioner to withdraw this petition on or before Friday May 15, 2020 and any conversion of the petition to a § 2254 petition will be deemed to occur thereafter if the petition is not withdrawn. Thus, this petition is deemed a §2254 petition. It must be dismissed because petitioner has not exhausted.

continue to be Priority 1 matters. He fails to explain why he did not file such a motion in the state court. This failure to exhaust is fatal not only to the instant motion for enlargement from custody, but also requires dismissal of the entire petition. For this reason, the Respondents file an accompanying motion to dismiss and memorandum of law.

Not only does the instant motion for enlargement, styled as a motion for temporary restraining order, lack a factual basis, it also lacks any legal basis, as explained further below. Despite a relatively lengthy string citation of cases, (Motion for TRO at 2), virtually every one of those cases involved either federal prisoners or ICE detainees, individuals who were in *federal,* not state custody. Even the lead case relied on by petitioner, *Mapp v. Reno*, is inapposite, because it involved a resident alien who brought a writ of habeas corpus challenging order of removal issued by Immigration and Naturalization Service (INS)(now known as Immigration and Customs Enforcement or ICE). *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). In the cases involving ICE detainees and federal prisoners, the habeas petitioners are at least petitioning in the proper forum, either before the federal sentencing or habeas court seeking a sentence modification under compassionate release provisions of federal law, the First Step Act[10] or the Cares Act or a habeas petition under §2241. As recently as May 21, 2020, Judge Meyer granted a motion for compassionate release and ordered the petitioner's sentence reduced to a term of time served as of May 22, 2020. *United States v. Vence-Small*, No. 3:18-CR-00031 (JAM), 2020 WL 2572742, at *1 (D. Conn. May 21, 2020). Reliance on those federal cases involving dfederal prisoners or ICE detainees is misplaced, as the standard for enlargement on bond by a convicted state prisoner is both distinct and substantially more difficult to meet. However, recently, in Griffin *v*

_____

[10] The First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment. See e.g. *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020).

*Commissioner of Correction*, TSR-CV-17- 4009012-S, Judicial District of Tolland at Rockville, Judge

Bhatt applied the *Mapp* standard and denied an emergency motion for bond, and stated in part,

> The habeas court's ability to set bail while the petition for writ of habeas corpus has
> not yet been adjudicated is to be exercised with "great caution," only when "special
> circumstances" require it and "rarely" when the "crime is serious," "The standard for
> bail pending habeas litigation is a difficult one to meet." *Grune v. Coughlin*, 913 F.2d
> 41, 44 (2d Cir. 1990).

*See* Memorandum of Decision on Petitioner's Emergency Motion for the Issuance of Bond, (May 20,

2020), attached as **Exhibit 5**; see also *Robert Day v. Commissioner of Correction,* CV-17-4008971-

S, J.D. of Tolland at Rockville (April 20, 2020), attached as **Exhibit 6**.[11]

None of the cases cited by petitioner in his lengthy recitation of cases, Pet. Memo at 2, Doc.

#13 at 9-10 of 46, involve the issues of comity and federalism that this court must face in this case.

None of the cases cited by petitioner involve an individual ordered by a state court to serve a period

of Special Parole, who is under the jurisdiction of a State Board of Pardons and Paroles, and who is a

three-time Special Parole violator. Indeed, the petitioner has no authority to support his claim in this

case, that this Court has any jurisdiction to serve as an appellate reviewer for a panel of the Board.

The significance of this petitioner's repeated history of failures to comply with both regular

and additional conditions of petitioner's special parole is that it is an important factor in the Board's

evidence-based decision-making process as to what sanction is appropriate as a disposition of the

parole violation. This most recent violation was Mr. Diaz's third violation since he began serving his

period of special parole in February of 2018. All three of petitioner's violations were for the same type

of behavior: tampering with GPS monitoring devices, avoiding or fleeing from supervision, and failing

---

[11] The original petition in this case was not filed until May 11, 2020, some three weeks after the habeas court
had issued its decision on an emergency motion for bond in the *Robert Day* case. Thus, there is no reasonable
basis in fact to allege the state courts were "closed" or "unavailable." Such as claim is belied by the actual
facts that the state courts are doing everything they can to expedite proceedings when emergency motions
based on claims of imminent risk to a prisoner's health due to the COVID pandemic.

to participate in programs. Given, that petitioner's repeated attempts to evade supervision and noncompliance with programs designed to address his criminogenic needs increase both his risk of flight and his risk of reoffending, the Board's April 23, 2020 decision to impose a lengthier sanction than previously imposed, a total of six months, was entirely appropriate.[12] The same factors, risk of flight and risk of reoffending weigh heavily against the petitioner here, since he is seeking enlargement from prison, to begin his Special Parole two weeks earlier that he otherwise would.

It would diminish the integrity of the Board's evidence-based decision making process, and would encourage offenders on parole or special parole supervision to act with impunity if they somehow saw the tragedy of the COVID-19 pandemic to be an excuse to act out in the community in violation of their conditions and to expect that the conditions either would not be enforced at all, or if sanctions were imposed they would be excused simply because of claims related to COVID-19.[13] Indeed, such lack of enforcement of appropriate sanctions could encourage individuals on parole or special parole supervision to violate their conditions and not expect, proportionate and appropriate consequences.[14]

Should this Court however find that the Petitioner gets past these preliminary jurisdictional hurdles, his claims still fail as he has presented an inaccurate picture of the current status inside Osborn CI and the extraordinary measures the DOC has taken to care for individuals in their custody in light of the COVID-19 pandemic. The efforts taken by the DOC belie the suggestion that they are failing to take the threat posed by COVID-19 seriously or that they have been deliberately indifferent in any way. Petitioner cannot establish that there has been any violation of his Eighth or Fourteenth Amendment rights arising from the current conditions at CCI, nor can he establish that the

---

[12] Sparaco Declaration, ¶ 26.
[13] *Id.* ¶ 27.
[14] *Id.* ¶ 28.

Respondents have failed to accommodate his disabilities in violation of the Americans with Disabilities Act ("ADA"). Accordingly, for all the reasons set forth above, herein below, and in the accompanying motion to dismiss, the petitioner's TRO for enlargement on bond, should be denied.

## I.     BACKGROUND AND FACTS

### A.  Petitioner's Conduct While on Parole and His Parole Revocation Hearing

On December 9, 2019, the DOC PCS Division issued a Remand to Actual Custody Order and returned petitioner to custody for violating the conditions of his special parole.[15] On January 14, 2020, a preliminary hearing was held at the Board's offices in Waterbury. Petitioner appeared by video and was represented by counsel.[16] At the conclusion of the January 14, 2020, preliminary hearing, Hearing Examiner Anderson found that there was probable cause to believe that Mr. Diaz had committed an act in violation of the conditions of his special parole. At that hearing, the Board's Hearing Examiner, George Anderson, also found that the acts committed by Mr. Diaz were serious enough to warrant revocation of special parole and that Mr. Diaz should be detained pending further revocation proceedings.[17] On January 22, 2020, the Chairperson found probable cause to warrant the reimprisonment of petitioner and issued a warrant for petitioner's re-imprisonment under seal.[18]

On March 27, 2020, a parole revocation hearing was held at the Board's offices in Waterbury. Petitioner appeared by video and was represented by counsel. During the hearing Petitioner's attorneys admitted that a longer sanction than the sanctions previously imposed would be reasonable given that petitioner was facing his third parole violation. However, Mr. Diaz's attorneys argued that (1) there

---

[15] Garibaldi Decl. ¶ 9, Exh. A thereto.  See Regulations of Conn. State Agencies, copy attached as **Exhibit 7**,
[16] Garibaldi Decl. ¶11; an audio recording of the Parole Revocation hearing is available for the District Court; according to undersigned counsel's understanding petitioner was represented at the parole revocation hearing by Attorney Marisol Orihuela, of the Yale Law School, Jerome N. Frank Legal Services Organization, and a certified law student intern.  The Court can take judicial notice that petitioner is represented  by the same counsel in this matter. The audio recording is referred to as Exhibit E to Garibaldi's Declaration.
[17] Garibaldi Decl. ¶ 12, Exh. C attached thereto.
[18] *Id*. ¶13; Exh. D, attached thereto.

was no evidence that further incarceration would be effective in promoting petitioner's successful reintegration; that (2) further incarceration would have a disproportionately harmful effect on petitioner in light of his mental illnesses and intellectual disability; and (3) that the COVID-19 pandemic presented extraordinary circumstances mitigated Petitioner's violation and justified his immediate release.[19]

At the conclusion of the March 27, 2020 parole revocation hearing, Hearing Examiner Anderson found petitioner to have violated his conditions of special parole by a preponderance of evidence. Specifically, Hearing Examiner Anderson ("Anderson") found that petitioner had removed his GPS tracking device without permission, absconded from and failed to return to his halfway house, failed to attend therapy sessions for mental health treatment, and failed to attend his behavioral management program for the treatment of problem sexual behavior. After considering petitioner's background, instant violation, history of previous violations, and the information provided by petitioner's attorneys, Anderson recommended six-months of imprisonment with time served as a sanction for the violations.[20] Anderson's reasons for recommending this sanction were his concerns regarding petitioner's risk of flight from and continued noncompliance with supervision balanced against what he considered to be mitigating information provided by petitioner's attorneys. A true and correct copy of the Revocation Hearing Summary is attached to Garibaldi's declaration as Exhibit F, and explains the rationale for the sanction and summarizes the basis for the conclusion that a six month sanction is appropriate in this case.

The summary, Exhibit F to Garibaldi's Declaration (**Exhibit 1**), p. 3 of 4, states as follows:

---

[19] Garibaldi Decl. ¶ 14; Exh. E attached thereto.
[20] The DOC field supervision parole officer who had submitted the parole violation report had recommended a sanction of twelve months imprisonment.

The parolee has 2 prior parole violations noted in the PVR[21] for Removing his GPS and leaving his approved residence on 12/2018 and July 2019. The parolee has one prior misconducted noted in the PVR but it was never served and there are some Halfway House infractions noted in the PVR. The field officer wrote in their recommendations that Mr. Jonathan Diaz #00391080 is currently serving a period of 3 years' special parole supervision. Mr. Diaz's instant offenses are Threatening 2 and Unlawful Restraint 2. These charges stem from Mr. Diaz sexually assaulting an adult female and threatening her with a knife. Mr. Diaz is not on the sex offender registry. In 2011 Mr. Diaz was arrested for Sexual Assault 2nd, Risk of Injury to a Minor sexual and Risk of Injury to a minor non-sexual. Mr. Diaz engaged in oral sex in a school bathroom with a 13-year-old juvenile female. Mr. Diaz was 17 years old at the time. Diaz was convicted of Risk of Injury to a minor as a Youthful Offender and given a period of probation. Mr. Diaz violated the terms of his probation by getting kicked of AIC, failing to attend Sex Offender Programming, failing to take prescribed medications and failure to work with mentor. Mr. Diaz had other arrests for Failure to appear, resisting and threatening. Mr. Diaz has failed to successfully complete Problem Sexualized Behavior Treatment. Mr. Diaz has two prior technical parole violations with similar behaviors, removing GPS and leaving his parole approved residence. The first technical violation was in December 2018. Diaz removed his GPS unit and absconded from a halfway house. Mr. Diaz was re-paroled in April 2019 and spent less than 3 months on supervision before absconding and removing his GPS unit again in July 2019. This marks the third technical violation in 12 months for Diaz. Based on this and his history of being non-compliant with community supervision, the field officer recommends Mr. Diaz's parole status be revoked and he remain incarcerated for a period of 12 months. It should be noted on 12-10-19 the field officer went to Hartford Corrections Center Block 3 to meet with and serve Mr. Diaz his Notice of Parole Violation. The field officer reviewed the charges, evidence and his rights for a preliminary and revocation hearing. Mr. Diaz refused to sign any paperwork and just stated he "didn't care" and "nobody understands me". Mr. Diaz then got up and walked away from the field officer.

Petitioner was offered an opportunity to testify, and his counsel indicated that he had elected not to testify. Of critical importance to public safety considerations, is the fact that petitioner is not merely remanded to custody for "technical violations," but in addition thereto he has a criminal history which includes petitioner's instant offenses, which are Threatening 2nd degree and Unlawful Restraint 2nd degree. These charges stem from Petitioner sexually assaulting an adult female and threatening her with a knife. The petitioner also has a history of problem sexual behavior. In 2011 petitioner was arrested for Sexual Assault 2nd, Risk of Injury to a Minor which was sexual in nature, and Risk of

---

[21] "PVR" means Parole Violation Report.

Injury to a minor non-sexual. Petitioner engaged in oral sex in a school bathroom with a 13-year-old juvenile female. Petitioner was 17 years old at the time. Petitioner was convicted of Risk of Injury to a minor as a Youthful Offender and given a period of probation. Petitioner violated the terms of his probation by getting kicked out of AIC,[22] failing to attend Sex Offender Programming, failing to take prescribed medications and failure to work with mentor.

1.  Chairman Giles' April 16, 2020 Memo and Mitigation Due to COVID-19

On April 16, 2020, the Chairperson of the Board, Carleton Giles, issued a memorandum directing Board Members and Hearing Examiners to consider the age and vulnerability of an offender to COVID-19 as a mitigating factor when rendering decisions in revocation cases.[23] A true and correct copy of the memorandum is attached to Garibaldi's Declaration as Exhibit G, and states:

> The mission of the Board of Pardons and Paroles is to facilitate the successful reintegration of suitable offenders into the community. As part of this mission, the current COVID-19 pandemic requires that we give appropriate weight to the potential risks facing certain individuals remanded to custody for violation of their conditions of parole or special parole. Effective immediately, all Board Members and Hearing Examiners must consider the age and vulnerability of the offender to COVID19 in accordance with the Centers for Disease Control and Prevention (CDC) guidelines as a mitigating factor when rendering the following decisions:
>
> Severity determinations under subsection (e) of Regs. Conn. State Agencies § 54-124a(j)(1)-5 Preliminary hearing and detention;
>
> Recommended sanctions under subsections (i) and (k) of Regs. Conn. State Agencies § 54- 124a(j)(1)-9. Revocation hearing; and
>
> Sanctioning decisions under subsection (m) of Regs. Conn. State Agencies § 54-124a(j)(1)-9. Revocation hearing.
>
> The considerations discussed above should guide decisions in revocation proceedings while the pandemic is ongoing, however, the position taken in each particular case is ultimately up to the Hearing Examiner or Board Members assigned to the case.

---

[22] "AIC" means Alternative Incarceration Center, a diversionary program to keep offenders out of prison and to afford them a chance at a program while being supervised by the Office of Adult Probation (OAP) a program administered by the state Judicial Branch's Court Support Services Division (CSSD).
[23] Garibaldi Decl. ¶ 16;

> As always, controlling weight when rendering the above decisions should be given to public safety and under no circumstance should those who present a risk to any person of the community be released. Furthermore, nothing in this memo should be construed as preventing Board Members or Hearing Examiners from considering any other aggravating or mitigating factors presented or provided during revocation proceedings.
>
> This memo will remain in effect unless sooner terminated by me or unless the Governor sooner repeals the declared public health and civil preparedness emergencies.

Thus, it is clear from the Chairman's memo, and the audio of the April 23, 2020, Board's meeting,[24] that the existence and the exigencies of the COVID-19 crisis were in fact considered by a panel of the Board in its difficult and complex considerations of balancing public safety, and the aggravating and mitigating factors involved in attempting to predict future risk. On April 23, 2020, a Revocation Board Action meeting was held. At the meeting a panel of three Board Members reviewed Hearing Examiner Anderson's findings and recommendations. The panel was comprised of Board Members Michael Pohl, Carmen Sierra, and Joy Chance. The panel considered the arguments made by Mr. Diaz's attorneys regarding COVID-19 and Mr. Diaz's mental illnesses as mitigating information when making their decision. A Board member, Ms. Sierra, is heard on the audio concluding that "Mr. Diaz has no interest in being helped." Her concern and the concern of all members of the panel was his risk to public safety and they questioned, "Do we reward him because of COVID? No. I personally would say EOS him."[25]

At the conclusion of the April 23, 2020 meeting, the panel voted to adopt Hearing Examiner Anderson's recommended sanction and revoke Mr. Diaz's special parole until June 9, 2020 by a two

---

[24] Garibaldi Decl. ¶ 17; The Audio recording of the Board's April 23, 2020 Revocation Action Meeting is Exhibit I, to Garibaldi's Declaration. A digital copy is simultaneously being emailed to the court and all counsel, and a manual filing will follow in the mail.

[25] Thus, Ms. Sierra in dissenting from the majority vote would have recommended "EOS" meaning "End of Sentence" or in this case, further incarceration until the end of the period of Special Parole, which is February 1, 2021.

to one vote. The Board subsequently issued a special parole mittimus committing Mr. Diaz to the custody of the Commissioner of Correction until June 9, 2020.

Further facts, as they relate to the conditions of confinement and the DOC's response to the COVID pandemic, and the DOC's efforts in complying with CDC guidelines for correctional facilities are set forth, as may be needed, below.

## II.    THRESHOLD ISSUES

### A.    Collateral Estoppel Bars the Petitioner From Seeking the Same Relief Here As He Sought Before the Board of Pardons and Paroles

"'[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.' *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (internal punctuation, citation and quotation marks omitted)." *Farrell v. Burke*, 449 F.3d 470, 482 (2d Cir. 2006). Because all the acts or occurrences at issue in this case take place in Connecticut with Connecticut residents and officials and employees of Connecticut state agencies, Connecticut state law governs this case, "and such implied consent is ... sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc*., 584 F.3d 33, 39 (2d Cir. 2009) (quotation marks and citations omitted). *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31–32 (2d Cir. 2017). "Collateral estoppel is a doctrine that 'prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim.' *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 300 Conn. 325, 343, 15 A.3d 601 (2011). An issue decided against a party in a prior proceeding *may not be relitigated* if: (1) it was 'fully and fairly litigated in the first action'; (2) it was 'actually decided'; and (3) the decision was

'necessary to the judgment.' *Id*. at 344, 15 A.3d 601 (quoting *Lyon v. Jones,* 291 Conn. 384, 406, 968 A.2d 416 (2009)). An issue is 'necessarily determined' if 'in the absence of a determination of the issue, the judgment could not have been validly rendered.' *Id*. Connecticut adheres to the rule of collateral estoppel articulated in the Second Restatement of Judgments, Restatement (Second) of Judgments § 27 (1982), which, in addition to setting forth the above rule, also provides that '[i]f an issue has been determined, but the judgment is not dependent on the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.' *Lyon,* 291 Conn. at 406, 968 A.2d 416 (quotation marks and citations omitted)." *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 32 (2d Cir. 2017).

Here the very same attorneys raised the very same claims and assertions regarding the dangers and the significance of the COVID-19 pandemic, the impacts of such a pandemic in a correctional environment, and also how COVID-19 should be considered as a mitigating factor.[26] Petitioner's counsel had a full and fair opportunity to litigate. They had the opportunity call witnesses, confront and cross-examine and they submitted about 110 pages of documentation to the Board. The Court can also take judicial notice that some of same exhibits filed in this case in support of the motion for TRO were also supplied to the Board's Hearing Examiner, George Anderson, and are listed on the Revocation Hearing Summary.[27] Much of the same 110 pages of evidence were submitted a second

---

[26] See and hear audio recordings Exhibits E and I to Garibaldi Declaration. Copies of the audio files are being submitted on a CD together with a notice of manual filing. To expedite consideration of the matters stated herein, a digital copy of the audio files, Exhibits E, the March 27, 2020 revocation hearing and Exhibit I, the April 23, 2020, Parole Action Meeting, are being attached to an email, and are emailed to petitioner's counsel of record and to the Judge's Courtroom Deputy. The CD also includes the preliminary hearing on January 14, 2020.

[27] See Silva Decl. Exh. D, ECF Doc. # 13-9; Garibaldi Decl. Exhibit F, at 3 of 4, lists the following evidence that was supplied to the Board by petitioner's counsel:
Exhibit 1 - Report by Dr. Merrill Matthew, 03/24/2020
Exhibit 1-A - Dr. Merrill Matthew's C.V.
Exhibit 2 - Declaration of Gregg Gonsalves, 03/23/2020
Exhibit 2-A - Gregg Gonsalves's C.V.
Exhibit 3 - CRT Attendance Record

time to the panel of the Board who also considered COVID-19 as a mitigating factor, and weighed it accordingly. Thus, the mitigation effect of COVID-19 was "actually decided" and "necessary to the judgment" made by the Board. All of the factors for applying collateral estoppel are met here. In effect, petitioner is seeking to appeal the decision of the Board by bringing this petition and motion but state regulations prohibit an appeal, and state, "There is no appeal from a decision to revoke or rescind parole." Conn. Agencies Regs. 54-124a(j)(1)-3.

A similar issue has been decided by at least one Connecticut Superior Court, on both res judicata and collateral estoppel grounds. See *Hanton v. Byrd*, No. CV-06-4020174, 2009 WL 3739379(Conn. Super. Ct. Oct. 7, 2009)(*Alander, J.*). In <u>Hanton</u>, Judge Alander concluded that "[p]ursuant to the doctrine of res judicata or claim preclusion, the plaintiff is prohibited from pursuing in the instant action 'any claims relating to the cause of action which were actually made or might have been made' in the earlier action. *Scalzo v. Danbury,* 224 Conn. 124, 128, 617 A.2d 440 (1992)." *Hanton v. Byrd*, *supra,* at *4. In concluding that collateral estoppel also barred Hanton from re-litigating his parole revocation in the state court proceeding, the state court noted that "'[a]s a general proposition, the governing principle is that administrative adjudications have a preclusive effect when the parties have an adequate opportunity to litigate.' (Citations and internal quotation marks omitted.) *Carothers v. Capozzielo,* 215 Conn. 82, 94, 574 A.2d 1268 (1990). A valid and final adjudicative determination by an administrative tribunal has the same conclusive effect, subject to the same qualifications, as a judgment of a court. *Id.* 'For an issue to be subject to collateral estoppel, it

---

Exhibit 4 - The Open Hearth Community Transition/Discharge Summary, 12/05/2019
Exhibit 5 - Jonathan Diaz Individualized Education PPT Team Cover Page, 12/10/2010
Exhibit 6 - Jonathan Diaz Individualized Education Program, 9/09/2011
Exhibit 7 - Odette Rivera Letter of Support
Exhibit 8 - Steffon Diaz Letter of Support
Exhibit 9 - Alexander Diaz Letter of Support
Exhibit 10 - Greg Davis Letter of Support
Exhibit 11 - Connecticut Children's Medical Center Discharge Instructions, 07/23/2008

must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment.' *Lafayette v. General Dynamics Corp./Electric Boat Div.,* 255 Conn. 762, 772, 770 A.2d 1 (2001). *Id.* at *5. Thus, because collateral estoppel requires the application of Connecticut law here, the findings of the Board are both conclusive, and also have preclusive effect here. This Court should give full faith and credit to the determination of the Board, in the interests of federalism and comity, and should not allow the petitioner to leapfrog into this Court where no jurisdiction exists.

### B. Failure To Exhaust Bars This Petition And Thus, Petitioner Has No Likelihood Of Success On The Merits

The Respondents rely on the accompanying motion to dismiss, and memorandum of law, in support of the motion to dismiss, for the failure to exhaust arguments, and respectfully claim that since the petition should be dismissed for failure to exhaust, the instant motion for a TRO to enlarge the petition on bond, should be denied as moot, with leave to renew, if he wishes, in the state court.

### III. ARGUMENT

### A. Petitioner Cannot Make A Substantial Showing Of Likelihood Of Success On The Merits As Is Required For A Mandatory Injunction As There Is No Eighth Amendment Violation, And No ADA Violation

"In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846– 47 (1994)) (other citations omitted). "A party moving for a mandatory injunction that alters the status quo by commanding a positive act must meet a higher standard, however. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995). That is, in addition to demonstrating irreparable harm, '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits, *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (internal quotation marks omitted), a standard

especially appropriate when a preliminary injunction is sought against government. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir.2006)." *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), opinion amended on denial of reh'g, 480 F.3d 138 (2d Cir. 2007). "A mandatory injunction, like a mandamus, is an extraordinary remedial process, which is granted, not as a matter of right, but in the exercise of a sound judicial discretion. It issues to remedy a wrong, not to promote one." *Morrison v. Work*, 266 U.S. 481, 490 (1925)[28].

## 1. TRO Standard And Higher Burden For Mandatory Injunction

"A motion for a temporary restraining order is governed by the same standards as a motion for a preliminary injunction." *Id.* (citing *Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir.1992)). "A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Tom Doherty Assoc., Inc., v. Saban Entertainment, Inc.,* 60 f3d 27, 33 (2nd Cir 1995). The Second Circuit has cautioned that preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and citation omitted).

---

[28]*See e.g., DeAngelis v. Ashraf*, No. 3:18-CV-1689 (MPS), 2019 WL 2453766, at *1 (D. Conn. June 12, 2019). ("[p]reliminary injunctive relief is an extraordinary remedy and is never awarded as a matter of right. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008); *Johnson v. Newport Lorillard*, No. 01-Civ-9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003)."); *Buffalo Forge Co. v. Ampco–Pittsburgh Corp*., 638 F.2d 568, 569 (2d Cir.1981) (quoting Medical Society of New York v. Toia, 560 F.2d 535, 538 (2d Cir.1977)). ("[I]nterim injunctive relief is an 'extraordinary and drastic remedy which should not be routinely granted.'"); *Vega v. Lantz*, No. 3:04-CV-1215(DFM), 2005 WL 1802145, at *1 (D. Conn. July 27, 2005), aff'd, 173 F. App'x 74 (2d Cir. 2006) ("In addition, a federal court should grant injunctive relief against a state or municipal official 'only in situations of most compelling necessity.' *Vorbeck v. McNeal*, 407 F. Supp. 733, 739 (E.D.Mo.), aff'd, 426 U.S. 943, 96 S.Ct. 3160, 49 L.Ed.2d 1180 (1976).").

"[W]here an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act…the moving party must meet a higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from a denial of the injunction." *Philip v. Fairfield University*, 1158 f3d 131, 133 (2ⁿᵈ Cir 1997). Additionally, "we have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty* at 33-34.

Mandatory injunctions "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir. 2011). A party seeking a mandatory injunction must make a "substantial showing of a likelihood of success" on the merits. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

The Petitioner is clearly requesting a mandatory injunction. His Motion for a Temporary Restraining Order and Enlargement of Custody (ECF Doc. #13) demands Petitioner's immediate release stating at 42 of 46, that he wishes for the Court "to order Mr. Diaz's release to a safe home environment where he can self-isolate and manage his psychiatric conditions, and will neither contract COVID-19 nor transmit COVID-19 to others." Petitioner motion for TRO, in the alternative asks for release on bond, *id*. at 43-45 of 46, which is not a typical restraining order maintaining to maintaining the status quo, but rather seek mandatory affirmative relief. Petitioner cannot meet this extremely high standard for a mandatory injunction that would in effect grant all the relief sought in the action.

"However, if the moving party is seeking a 'mandatory injunction,' meaning an injunction that changes the status quo by commanding the opposing party to perform a positive act, then he must

satisfy an even higher standard of proof with respect to the first prong. *Lopez v. McEwan*, 08 Civ. 678 (JCH), 2010 WL 326206, *8 (D. Conn. Jan. 22, 2010). He 'must make a clear or substantial showing of a likelihood of success on the merits, ... a standard especially appropriate when a preliminary injunction is sought against the government.' *Id.* (quoting *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006)). With respect to the second prong, the likelihood of irreparable harm must be 'actual and imminent,' not speculative. *Id.* (quoting *New York v. Nuclear Regulator Comm'n*, 550 F.2d 745, 775 (2d Cir. 1977))." *Blaine v. UConn Health Care*, No. 3:18-CV-359 (MPS), 2018 WL 1368909, at *3 (D. Conn. Mar. 16, 2018).

**2. The Petitioner Cannot Make A Substantial Showing Of Likelihood Of Success On The Merits As There Is No Eighth Amendment Violation**

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety…a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions…Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). (internal citations and quotation marks omitted.)

"[A]lthough accidental or inadvertent failure to provide adequate medical care to a prisoner would not violate the Eighth Amendment, "deliberate indifference to serious medical needs of prisoners" violates the Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v.. McKinney*, 509 U.S. 25, 32 (1993) quoting *Estelle v. Gamble*, 429 U.S.97, 104 (1976).

"[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer* at 847.

A corrections official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment…a prisoner advancing such a claim must, at a minimum, allege deliberate indifference to his serious medical needs…It is *only* such indifference that can violate the Eighth Amendment… allegations of inadvertent failure to provide adequate medical care or of a "negligent ... diagnos[is]…simply fail to establish the requisite culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (Emphasis in original) (Internal citations and quotation marks omitted.)

In the present case, the Respondents do not challenge that the COVID-19 pandemic currently facing the country is not a serious medical crisis. The Respondents are aware of the crisis, the need to address it, and they have been addressing it since even before March 1, 2020. As is pointed out in great detail in the declaration of Dr. Byron Kennedy, and in his deposition, the DOC and the individual wardens have done extensive work to mitigate the spread and impact of the COVID-19 pandemic into individual facilities.[29] To indicate anything to the contrary severely belittles the

---

[29] The declaration of Dr. Kennedy is attached as **Exhibit 8,** and his deposition transcript in *McPherson v. Lamont*, 3:20-CV534(JBA) is **Exhibit 9.** Of course, the situation is extremely fluid and the numbers change on a daily basis, especially no that DOC has commenced the mass testing of all inmates. DOC has a COVID-19 tracker on its website. See https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories; as of 5/22/2020, the DOC reports a total of 789 inmates who have contracted the coronavirus, 507 inmates who have been medically cleared and returned to their facilities, and 40 inmates in isolation at Northern CI. *See id.,* DOC COVID tracker, last visited May 25, 2020). The details of what is occurring at Osborn CI is set forth in the Declaration of Warden Rodriguez. Attached as **Exhibit 10.**

extraordinary work put in by DOC officials and the individual staff members.  While DOC officials are clearly aware of the pandemic, they have taken extraordinary measures to mitigate the impact.  All the measures taken by the DOC are clearly reasonable in light of the current situation.  The facts of this case clearly demonstrate not only that is there no deliberate indifference by the Respondents themselves, but that DOC officials have done everything with an eye towards protecting the health and safety of those in their charge.    The increase in testing and counting COVID-19 infections does not establish the requisite subjectively culpable state of mind. *See Farmer*, 511 U.S. at 844; *Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *4 (11th Cir. May 5, 2020). To the contrary, such testing exceeds the recommendations of the CDC, which are attached as Exhibit A to Dr. Kennedy's Declaration. The DOC is in fact following CDC guidelines, and other expert recommendations and there is no evidence to establish that the defendants subjectively believed the measures they were taking were inadequate. *See Valentine v. Collier*, No. No. 20-20207, 2020 WL 1934431, at *4 (5th Cir. Apr. 22, 2020) ("[T]reating inadequate measures as dispositive of the Defendants' mental state ... resembles the standard for civil negligence, which *Farmer* explicitly rejected."). *Swain v. Junior*, at *4 .

At best, the record can be read to show some disagreement as to whether the measures taken by the DOC are what the Petitioner would want.  *See Valentine v. Collier*, ___, F.3d, ___, 2020 WL 1934431, at *4 (5th Cir. April 22, 2020) "Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference."  Even if proven, that claim would amount at best to negligence.  "[I]n order to show deliberate indifference, a plaintiff must show something more than mere negligence." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).  The is no basis in fact for Petitioner to prevail here as to the extremely difficult standard

for an eighth amendment violation that the Respondents were reckless or otherwise deliberately indifferent to the Petitioner's serious medical needs.

### 3. The Petitioner cannot make a substantial showing of likelihood of success on the merits as there is no ADA violation

Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities by depriving them of opportunity to participate in the services, programs, or activities of the public entity because of their disabilities. 42 U.S.C. § 12132. Title II of the ADA applies to prisons, as "[s]tate prisons fall squarely within the statutory definition of "public entity" under the ADA. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

In order to establish a prima facie violation under Title II of the ADA, Petitioner must show "1) he is a qualified individual with a disability; 2) DOC is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOC's services, programs, or activities or DOC otherwise discriminated against him by reason of his disability." *Wright v. New York Dept. of Corrections,* 831 F.3d 64, 72 (2nd Cir, 2016). A qualified individual can base a discrimination claim on any of "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord,* 591 F.3d 37, 43 (2nd Cir. 2009). "The ADA requires only that a particular service provided to some not be denied to disabled people." *Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir.1999).

There are no allegations which would provide facts to support a claim under the theory of intentional discrimination nor could there be. Nor has the Petitioner alleged that he was denied one of the release mechanisms due to his disability. The Petitioner would be equally unavailing under the second theory of disparate impact. There are no allegations indicating that the discretionary decisions of the Respondents during this crisis have had a disproportionate impact on disabled inmates.

There is no allegation either in his declaration or elsewhere in the pleadings that he requested treatment and it was denied. To the contrary per the health record review conducted by Melinda Jarjura, RN, BSN, petitioner was seen my mental health professional on nineteen (19) separate occasions since December 9, 2019, including two psychiatrist visits, one visit with the psychologist and mental health APRN, and seven social worker visits and an additional eight visits with a mental health counselor.[30] In fact, the relevant documents show this Petitioner himself refused the need for mental health treatment that has been offered to him, refused mental health housing, and declined any offered psychiatric medications. See Jarjura Decl. sealed Exhibit A, attached thereto.

The Petitioner has not produced sufficient facts to show any violation of the ADA. Petitioner, prior to the pandemic, he had refused mental health treatment when offered to him and was educated on how to request treatment should it be necessary in the future. Since the beginning of the pandemic the Petitioner has not requested mental health treatment, does not take mental health medication nor is there any allegation that either treatment or medication was requested and refused. There is no allegation of any discriminatory treatment toward petitioner due to an alleged disability. There has been no violation under the ADA.

Further, the is absolutely no authority which stands for the proposition that release from prison is the kind of relief that can be afforded as a remedy for an ADA violation. Petitioner here, is not like the prisoner in *Yeskey, supra,* who was denied the ability to go to the intensive boot camp due to a medical disability. Here, Petitioner's counsel reached out to DOC and argued that the Petitioner had some disabilities. When Petitioner was offered a transfer to the mental health unit and other related services, he declined. Jarjura Decl. sealed Exhibit A. There is no factual basis for an ADA claim, rather petitioner's parole was revoked because he was a three time parole violator who had a prior

---

[30] The Declaration of Melinda Jarjura is attached as **Exhibit 11.** A detailed chart review summary is filed under seal as Exhibit A, attached thereto.

criminal history of sexual assault, and violent sexual assault, repeatedly cut of his GPS, absconded, and failed to positively engage in any treatment programs. His own attorneys admitted at the parole revocation hearing that a six-month graduated sanction was reasonable, under the circumstances. See Garibaldi Decl. and audio of revocation hearing.

As the Petitioner cannot make a substantial showing of likelihood of success on the merits of any of his claims, he has not satisfied the requirements for a TRO and his case should be dismissed.

### 4. The Petitioner Cannot Make A Showing Of Irreparable Harm As Any Alleged Harm Is Neither Serious Nor Irreparable

"[I]nterim injunctive relief is an 'extraordinary and drastic remedy which should not be routinely granted.' " *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981) (quoting *Medical Society of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977)). In addition, a federal court should grant injunctive relief against a state or municipal official "only in situations of most compelling necessity." *Cerilli v. Rell,* No. 3:08CV242(SRU), 2010 WL 1330998, at *1 (D. Conn. Mar. 31, 2010). "Although a showing that irreparable injury will be suffered before a decision on the merits may be reached is insufficient by itself to require the granting of a preliminary injunction, it is nevertheless the most significant condition that must be demonstrated." *Cerilli v. Rell,* 2010 WL 1330998, at *2 (quoting *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985)). "To demonstrate irreparable harm, plaintiff must show an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Id.* (quoting *Forest City Daly Housing, Inc.,* 175 F.3d at 153).

In the Second Circuit, a "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559

F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted). That harm must be "actual and imminent" rather than speculative. *Id*.

Although Petitioner goes into great length to describe the grave nature of the current COVID-19 pandemic, and he raises abstract and generalized medical observations and opinions, Petitioner wholly ignores the actual facts of this case. See Jarjura declaration, and sealed Exhibit A, attached thereto. The facts of this case reflect that Petitioner is not in any imminent risk, and to the contrary is wholly asymptomatic. It is questionable whether Petitioner's present condition even rises to the level of a serious medical condition, as he has no fever, cough or any other symptoms related to novel coronavirus infection, although he recently tested positive. According the CDC guidelines, he must be quarantined to protect the health and safety of others.[31] The Respondents have never taken the position, and do not now, that the pandemic is anything less than a significant medical crisis. Petitioner assumes in his moving papers that he is at grave risk of exposure to COVID-19. But fear of the virus is not sufficient. There are insufficient facts to show that the DOC is unable to properly manage the current challenges posed by the virus.

There are insufficient facts to suggest that the Petitioner will suffer irreparable harm. Although Petitioner claims he has a condition which puts him at risk, arguably a mental health condition, such a condition has never been confirmed by the CDC as a risk factor. He is only 26 years of age and misses the age group identified by the CDC as high risk, over age 65, by being about 39 years too young. Nowhere does the CDC list PTSD or ADHD, or any such mental health issue as a risk factor.

---

[31] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html; the CDC recommends: "For individuals who had a confirmed positive COVID-19 test but never showed symptoms: At least 7 days have passed since the date of the individual's first positive COVID-19 test and the individual has had no subsequent illness. Recently that guideline by the CDC has been revised upward to 10 days. See Kennedy Deposition at 39-40. The DOC protocol is even more protective of public health and requires 14 days symptom free. See Kennedy Deposition at 91. Dr. Kennedy's Deposition is **Exhibit 9**.

**5. The Balance Of The Equities And Public Interest Weigh Strongly In Favor Of The Respondents**

"A balance of hardships tipping decidedly toward the party requesting a preliminary injunction means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a 'real hardship.'" *Doe v. Zucker*, No. 117CV1005GTSCFH, 2019 WL 111020, at *6 (N.D.N.Y. Jan. 4, 2019) (emphasis added) (quotation omitted). "'A balance of equities tipping in favor of the party requesting a preliminary injunction' means a balance of the hardships against the benefits." Id. (citing *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *see also Jones v. Nat'l Conference of Bar Examiners*, 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities).

"[A] preliminary injunction is 'in the public interest' if the preliminary injunction would not 'cause harm to the public interest.'" *Doe*, 2019 WL 111020, at *7 (quoting *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). "The 'public interest' is defined as '[t]he general welfare of the public that warrants recognition and protection,' and/or '[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation.'" *Id*. (quoting Black's Law Dictionary at 1350 (9th ed. 2009)).

It is in the public interest that Petitioner continue to be monitored as Osborn CI in his quarantine unit, where his temperature is taken daily, there is 24/7 nursing coverage, infectious disease specialists, and an ability to provide appropriate monitoring and supervision such that Petitioner does not either abscond from supervision, as he has done in the past, or otherwise relapse into illegal drug use. The record is clear that Petitioner's prior history in the community reveals an inability to comply

with conditions of supervision. It is highly questionable whether Petitioner would comply with social distancing procedures once released from Osborn CI, and in order to protect the public's health and safety it would be irresponsible to release petitioner at this point in time until he has been medically cleared, and it can be confirmed that he has recovered from his coronavirus infection. This is done in accordance with CDC guidelines, as described.

### B. Petitioner Cannot Meet The Exceedingly Rare Standard For Bond As He Fails To Demonstrate It Is So Substantially Probable He Will Prevail He Can Declare Victory Now

Notwithstanding the lack of an absolute right to bail, in exceedingly rare cases, the Second Circuit has stated, "A district court has inherent power to enter an order affecting the custody of a habeas corpus petitioner who is *properly before it* contesting the legality of his custody." *Ostrer v. United States,* 584 F.2d 594, 596 n. 1 (2d Cir.1978) (emphasis added). This case is not properly before the District Court, but in the interest of comity and federalism, should rather be filed as a state court habeas petition. See 28 U.S.C. §2254. The Second Circuit was careful to point out that it had "consistently, emphasized that this power is a limited one, to be exercised in special cases only." *Mapp v. Reno,* 241 F.3d 221, 226 (2d Cir.2001). As the Circuit explained *Ostrer,* "a habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *Ostrer,* 584 F.2d at 596 n. 1 (internal quotation marks and citation omitted); *accord Mapp,* 241 F.3d at 226; *see also Grune v. Coughlin,* 913 F.2d 41, 44 (2d Cir.1990) (noting that "[t]he standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective") (internal quotation marks omitted) (alterations in original).

In *Mapp*, the Second Circuit discussed the history of how it arrived at the principle that federal courts have "inherent power" to admit a habeas petitioner to bail. But the Court went on to note that the availability of bail to a habeas petitioner is an oddity, quite rare, requiring a showing that is "difficult to meet," and stating:

> Even as we have acknowledged the authority of the federal courts to grant bail to habeas petitioners, however, we have also, and consistently, emphasized that this power is a limited one, to be exercised in special cases only. As we noted in [an earlier case], a habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail <u>necessary to make the habeas remedy effective</u>.

*Mapp at 226.* This last clause is critical. The remedy that the petitioner is seeking by way of his Petition is release on the basis that the potential dangers of COVID-19 infection violate his eighth amendment rights and his rights under the ADA.[32] His prayer for relief in such a conditions of confinement case, it seems logical to presume, differs from release, but rather must be narrowly tailored to remedy the alleged constitutional violation. See 18 U.S.C. § 3626(a)(1). The PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). *Handberry v. Thompson*, 446 F.3d 335, 346 (2d Cir. 2006). Arguably If narrowly tailored petitioner would be seeking better or different medical treatment as a remedy, and for a court to order that the respondents provide medical treatment, not release. It is Petitioner's burden, and it is an extremely difficult one to meet, where medical records, expert testimony, and

---

[32] Petitioner has made no allegations in his underlying operative Petition that he is being denied medical care. As this Court may be aware, there are large numbers of state habeas petitions raising medical issues claiming eighth amendment violations. See *Faraday v. Comm'r of Correction*, 288 Conn. 326, 328, 952 A.2d 764, 767 (2008); *Sanchez v. Warden,* 214 Conn. 23, 33 570 A.2d 673 (1990); *Arey v. Warden,* 187 Conn. 324, 445 A.2d 916 (1982); *Hunnicutt v. Comm'r of Correction*, 67 Conn. App. 65, 69, 787 A.2d 22, 25 (2001). Petitioner makes no such claim and petitioner has failed to avail himself of his state court habeas remedy.

evidence on the respondent's efforts to provide satisfactory conditions and so forth would come into play.[33]  But none of these claims makes bail "necessary to make the habeas remedy effective" with respect to the remedy sought in this Petition.

Indeed, it cannot reasonably be argued, in light of the extraordinary efforts made by the DOC to comply with CDC guidelines for the management of COVID-19 in detention and correctional facilities, and the undisputed health care records that petitioner has been seen on 25 or more occasions by professional licensed health care clinicians, that there is any basis in fact or law for an alleged eighth amendment violation.  Similarly, there is no basis in fact or law to claim that the ADA is violated in this case or that an alleged ADA violation warrants to extraordinary relief of enlargement of custody and release from confinement.

There is no debate that the COVID-19 pandemic is the most significant health crisis this country, indeed the world, has faced in recent times.  The impact on the State of Connecticut is no less significant.  Everyone has been impacted by the COVID-19 pandemic and the inmate population is no exception.  However, to allege that the DOC has not taken the pandemic seriously and that the Respondents have not diligently instituted protocols and procedures in order to combat the virus and protect the health and safety of the inmates in their custody is a gross misunderstanding. See Kennedy Declaration and Deposition.

As of May 24, 2020, the total inmate population in DOC facilities stands at 10,495.  That is a substantial drop in population from March 1, 2020, where the inmate population a total of 12,409.  That is a reduction of 1,914 inmates (approximately 15.4%) in custody within a span of  less than

---

[33] *See* Declaration of Melinda Jarjura, **Exhibit 11**, and her health record summary, Exhibit A attached thereto under seal. See also Declaration of Dr. Byron Kennedy**, Exhibit 9** and his deposition transcript, **Exhibit 10**, which are also attached hereto in opposition to the Motion for a TRO.

three months.  In addition to reducing the inmate population the DOC has implemented significant measures to combat the pandemic.

On March 23, 2020 the CDC provided guidance to correctional and detention facilities[34].  In an effort to conform to the guidelines the DOC took many steps to prevent or minimize infiltration of the virus into their facilities.    Social visits were cancelled, quarantine of new admits, limiting inmate transfers, and cancelling volunteer and limiting contractor access were initiated early on.  (Exhibit 8, Kennedy Decl., at 3-4, ¶18.)  All staff members have their temperatures checked prior to entry into the facility.  *Id*.  If any staff member has a temperature greater than 100.4 or exhibits any COVID-19 related symptoms they are denied entry.  *Id.* at 4, ¶19.  Within the facilities other measures were taken to prevent or further limit the spread of the virus.  Soap and cleaning supplies are widely distributed, common areas and frequently touched surfaces are cleaned and disinfected, and recreation was modified to increase social distancing measures.  *Id.* ¶20.  Where feasible inmates have been provided their meals in their cells to further increase social distancing.  *Id*.  Inmates have been provided education on proper hygiene via posters and/or memos handed to them.  *Id*. at 5, ¶26.

Unfortunately, the COVID-19 virus did impact some facilities more than others and both staff and inmates have been infected. As explained in Dr. Kennedy's Deposition mass testing began at Osborn CI, and approximately 600 inmates were tested with a positive rate less than 25%. Kennedy Depo at 59-60. (Exhibit 9)

 In an effort of transparency, the DOC created a COVID-19 Tracker and placed it online[35]. The tracker is maintained constantly with data updated daily.  According to the tracker as of May 24, 2020, with increased mass testing at both Osborn and Corrigan-Radgowski, there have been 789 total

---

[34] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.  *See also*, Declaration of Dr. Byron Kennedy (attached, **Exhibit 8**)
[35] https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories

inmates who have contracted COVID-19 with 507 of them being medically cleared and returned to their original facility. 375 staff members have contracted COVID-19 with 334 being medically cleared to return to work. The DOC implemented protocols for the quarantine of possible cases of infection and the medical isolation of those testing positive or exhibiting symptoms. *Id*. at 4, ¶¶22-23. As of April 7, 2020, the Northern Correctional Institution ("NCI") was designated as the medical isolation unit. *Id*. at 2, ¶10. NCI was chosen because, consistent with CDC Guidelines, it was the best match for medical isolation as it has single cells with individual bathroom facilities, solid walls and doors, and has separate airflow from other parts of the facility. *Id*. at 2-3, ¶12. If a staff member is exhibiting symptoms during their shift, despite passing the initial protocols for entering a facility, they are immediately isolated and sent home, a review of who they have come into contact with is conducted and those individuals are monitored for symptoms. *Id*. at 5, ¶25. Any areas the employee came into contact with are then cleaned and disinfected. *Id*.

When an inmate, such as this petitioner, is placed in quarantine, he is subjected to close monitoring making sure nursing staff are identifying symptoms. If a person is on quarantine or if a person is already confirmed positive, DOC is able to monitor any worsening of their systems and that means nursing staff are listening to their lungs or doing the pulse ox checks to determine of saturation rates have gone down. See Kennedy Deposition at 90. There is no factual basis for an eighth amendment violation because there obviously is not a scintilla of evidence to support the subjectively culpable state of mind prong necessary to make out an eighth amendment violation.

With regard to enlargement of custody or release on bail, petitioner cannot meet the extraordinarily high standard of demonstrating success. The petitioner must show "a demonstrated likelihood that the petition will prevail, based upon claims of a substantial nature upon which the petitioner has a high probability of success ... so that victory for petitioner can be predicted with

confidence." *United States v. Whitman*, 153 F. Supp. 3d 658, 660 (S.D.N.Y. 2015) (quoting *United States v. Yarmoluk*, No. 96-cr-863 (JSR), 1997 WL 642564, at *1 (S.D.N.Y. Oct. 17, 1997))(other citations omitted).

On May 20, 2020, a state court habeas judge, the Hon. Tejas Bhatt, relying on *Mapp, supra*, and his prior decision in *Robert Day v. Commissioner*, concluded that the state habeas court had the inherent authority to release a state habeas petitioner on bond. pending disposition of a state court habeas matter. *Griffin v Commissioner of Correction,* TSR-CV-17- 4009012-S, Judicial District of Tolland at Rockville (Conn. Super Ct. May 20, 2020).[36]  In *Griffin*, attached, at 16, the state habeas court noted that DOC "has established protocols to prevent and minimize the spread of COVID-19,including providing PPE to incarcerated individuals and staff. These actions by DOC do not establish deliberate indifference and thus, there is no substantial likelihood of success at this time." Thus, that motion for bond, like the instant motion here, should be denied.

*In  Money v. Pritzker*, No. 20-CV-2093, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020), the District Court, denied preliminary injunctive relief, where the state officials, like the Respondents in this case, had undertaken a lengthy list of actions in response to COVID-19 and had implemented numerous measures consistent with CDC guidelines. In words very fitting for this case, the District Court h in *Pritzker* stated bluntly, "plaintiff's have no chance of success." The same applies here. The *Pritzker* court noted, as follows:

"Deliberate indifference, as the Seventh Circuit has explained, imposes a 'high hurdle,' for it requires a showing 'approaching total unconcern for the prisoner's welfare.' *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (internal quotations and citation omitted). Neither 'negligence [n]or even

---

[36] A copy of Judge Bhatt's Memorandum of Decision in Griffin is attached to the Response to the Order to Show Cause as  **Exhibit  5,** and a copy of his decision in *Robert Day*, is **Exhibit 6.** .

gross negligence is enough; the conduct must be reckless in the criminal sense.' *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). And, given the constantly shifting parameters and guidance regarding how to combat a previously little known virus, it is worth pointing out that 'the mere failure * * * to choose the best course of action does not amount to a constitutional violation.' *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Under this standard, Plaintiffs have no chance of success. Defendants have come forward with a lengthy list of the actions they have taken to protect IDOC inmates." *Money v. Pritzker*, No. 20-CV-2093, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020). The same applies here. As this Petitioner has no chance of success on the merits, he cannot prevail on his motion for a TRO to be enlarged from custody.

## **CONCLUSION**

For all the foregoing reasons, and for the reasons set forth in the respondent's opposition papers, declarations and deposition of Dr. Kennedy, the Motion for Temporary Restraining Order for the Enlargement of the petitioner should be denied.

RESPONDENTS

ROLLIN COOK, *et al*,

WILLIAM TONG
ATTORNEY GENERAL

BY: /s/ Lisamaria T. Proscino
Lisamaria T. Proscino
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct30588
Tel: (860) 808-5450
Fax: (860) 808-5591
E-Mail: Lisamaria.Proscino@ct.gov

BY: /s/ Steven R. Strom
Steven R. Strom
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct01211
Tel.: (860) 808-5450
Fax: (860) 808-5591
E-Mail: steven.strom@ct.gov

## **CERTIFICATION**

I hereby certify that on May 26, 2020 a copy of the foregoing was filed electronically. Notice

of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ Steven R. Strom
Steven R. Strom
Assistant Attorney General